759 A.2d 249

**OFFICE OF THE GOVERNOR et al.**

v.

**WASHINGTON POST COMPANY.**

**No. 117, Sept. Term, 1998.**

Court of Appeals of Maryland.

Sept. 12, 2000.

⚬⇒54

Lawrence P. Fletcher-Hill, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellants.

Carmen M. Shepard, Deputy Atty. Gen. (reargued), for appellants.

Jonathan J. Frankel (Stephen H. Sachs, Patrick J. Carome, Tarnisha A. Graves, Wilmer, Cutler & Pickering, on brief), Washington, DC; Eric N. Lieberman, Washington, DC, of counsel, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASNOW, RAKER, WILNER and CATHELL, JJ.

Reargued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

ELDRIDGE, Judge.

This case involves the extent to which telephone bills for telephones used by the Governor and two of his staff members, and the Governor's unpublished appointment schedules, are subject to public disclosure under the Maryland Public Information Act, Maryland Code (1984, 1999 Repl.Vol.), §§ 10–611 through 10–630 of the State Government Article.[1]

## I.

In November and December 1996, the Washington Post Company (the Post), through its agents, reporters Mary Pat Flaherty and Charles Babington, requested telephone and scheduling records, pursuant to Maryland's Public Information Act, from the Office of the Governor. Ms. Flaherty's request sought the telephone records of "the Governor and his staff" over a two-year period, including

"[a]ll phones in the Governor's Mansion [Government House]; his State House offices; all phones in Shaw House (an annex office in Annapolis); all phones in the Washington and Baltimore offices; all car phones and cellular phones used by the governor and anyone on his staff."

Mr. Babington's request for appointment or scheduling records was limited to the Governor but also spanned a two-year period. He requested

"[a]ll calendars indicating the persons, times, dates, and locations of meetings involving Governor Glendening in his official capacity as governor. This should include meetings

---

1. Unless otherwise indicated, all statutory references are to the Maryland Public Information Act, §§ 10–611 through 10–630 of the State Government Article, hereafter sometimes referred to simply as "the Act."

in his State House office as well as those in Baltimore and other places where the governor conducts business."

Both requests were granted in part and denied in part.

The Office of the Governor (the Office) provided Ms. Flaherty with the aggregate cost of the telephone calls specified in her request; however, it denied the release of any "call detail," including the date, time, and length of each call. The Office asserted executive privilege, citing § 10–618(b) of the Act and this Court's opinion in *Hamilton, Superintendent v. Verdow,* 287 Md. 544, 414 A.2d 914 (1980), as well as cases in other states holding that telephone and scheduling records are exempt from disclosure under their corresponding public information acts.[2] The Office released the Governor's public agendas to Mr. Babington but denied the remainder of his request, stating that the appointment or scheduling records were not "public records" within the meaning of § 10–611(g) of the Act, and also invoking executive privilege, citing § 10–618(b) and *Hamilton.*[3]

Negotiations between the parties continued throughout much of 1997, and during that time the Post narrowed its request. With respect to telephone records, the Post limited its request to the telephone records of calls by the Governor, Chief of Staff Major E. Riddick, Jr., Senior Advisor Susan Smith–Bauk, and Secretary of State John F. Willis, over the

---

**2.** Section 10–618(b) of the Maryland Public Information Act provides as follows:

"(b) *Interagency and intra-agency documents.*—A custodian may deny inspection of any part of an interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the unit."

In addition, § 10–615 provides in pertinent part that "[a] custodian shall deny inspection of a public record or any part of a public record if: (1) by law, the public record is privileged or confidential...."

**3.** Section 10–611(g) of the Act defines "public record" as "the original or any copy of any documentary material that:

"(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and

(ii) is in any form, including ... a computerized record...."

six-month period from February 1, 1996, through July 31, 1996. In addition, Mr. Babington's original request for appointment records was also limited to the same six-month period. Despite these changes, the Office still refused to comply with the Post's request.

As a result, on December 4, 1997, the Post brought suit in the Circuit Court for Anne Arundel County against the Office of the Governor and Governor Parris Glendening. Under the Post's complaint, the records sought were those asked. for after the Post had narrowed its request, namely records of telephone calls by specified individuals and appointments of the Governor, covering only the six-month period. The Office and the Governor filed a motion for summary judgment, claiming that all of the records fell within § 10–618(b) and the doctrine of executive privilege. They also argued that public disclosure of the Governor's daily schedules, even after the fact, would pose a threat to the personal security of the Governor and those around him.[4] In addition, they claimed that some of the documents were also exempt from disclosure under other sections of the Act, specifically the exemptions for

---

4. The Governor's appointment or scheduling records consisted of four types of documents: (1) a handwritten appointment book; (2) an electronic "working" schedule; (3) the last-edited version of the working schedule; and (4) the Governor's personal daily schedule, printed for him on a note card. The handwritten appointment book is created by Ms. Joanne Trumbule, the Governor's Director of Scheduling, and her immediate staff, by penciling in the many requests for meetings with the Governor. This book also includes the Governor's personal appointments and family engagements. The same group of people then prepare the electronic working schedule, which includes "the time, location, persons attending, and staff person responsible for the designated activity." Some entries also include the subject matter of the appointment or event. Personal activities are also noted on the working schedule. The working schedule is distributed by electronic mail to the Governor's staff for input, and then is refined further, either by canceling appointments, scheduling new appointments, or editing the specific information on already-existing appointments. The "last-edited version" of the working schedule is then used to create the Governor's personal daily schedule, which is prepared by Ms. Trumbule or an assistant late in the afternoon of the preceding day. The personal daily schedule is distributed to the Governor, the Maryland State troopers assigned to protection of the Governor, and a small group of staff members.

records containing confidential personnel information (§§ 10–616(d) and (i)), confidential commercial information (§ 10–617(d)), confidential employee information (§ 10–617(e)), or confidential financial information (§ 10–617(f)). The defendants argued that these specific exemptions under the Act would require redactions that were "virtually impossible to accomplish." Finally, they argued that the Post's request for the telephone records of Secretary of State Willis was barred because he had not been joined as a party to the action.

Pursuant to an order of the court, the Governor and his office submitted *in camera* sample copies of the appointment schedules and telephone records, as well as affidavits from the Governor and numerous staff members, including Joanne Trumbule, the Governor's Director of Scheduling, Robert Platky, the Director of Financial Administration for the Office of the Governor, and State Police Lieutenant Gary Shields, Commander of the Governor's Protection Unit.

The Post filed a cross motion for summary judgment, arguing that the documents at issue were not "interagency or intra-agency letter[s] or memorand[a]" within the meaning of § 10–618(b) of the Act, and that, as purely factual material, the documents were not privileged. According to the Post, any threat to the Governor's security as a result of the release of the requested records, even if true, did not constitute an "independent justification recognized under the [Act] for withholding public records." Finally, the Post contended that the exemptions claimed for commercial information, financial information, and personnel records did not apply to the records at issue and that, alternatively, even if parts of the records were within such exemptions, the defendants were not justified in withholding all of the records.

A hearing was held on the motions for summary judgment in May 1998. In early July 1998, the Circuit Court issued an opinion and order denying the motions. The court held that the doctrine of executive privilege was incorporated into the Act in both § 10–618(b), as argued by the Office and the Governor, and also in § 10–615(1), which requires non-disclo-

sure when "by law, the public record is privileged or confidential." As a result, the court held that whether the documents fit within the definition of "memorandum" under § 10–618(b) was irrelevant if the documents were privileged under the doctrine of executive privilege. Citing *Hamilton, Superintendent v. Verdow, supra,* 287 Md. 544, 414 A.2d 914, the Circuit Court found that a purpose of that privilege "is to promote the efficient operation of the government by allowing the Governor to solicit advice from a wide range of people without fear that public disclosure will restrain the free flow of that advice." The court also stated that the privilege was not absolute, and that the evidence was insufficient to determine whether the records might be privileged under § 10–618(b) and/or § 10–615(1). Accordingly, the court ordered the defendants to produce all telephone and scheduling records to the Post for which the defendants were not claiming privilege, submit to the court for an *in camera* review all records claimed to be privileged, and submit to the court a proposed redacted version of those records with a detailed memorandum explaining why the redacted information was privileged.

Two weeks after the Circuit Court's opinion and order, the Post filed a motion requesting the court to set a compliance deadline for the defendants. One week later, the defendants filed a motion for clarification and reconsideration, again asking the court to recognize a categorical executive privilege as to all documents at issue and asserting that compliance with the opinion and order would be excessively burdensome. After a hearing, the court granted the Post's motion and set the compliance deadline for September 5, 1998, which was subsequently extended to September 11, 1998. The court denied the defendants' motion for reconsideration, stating that "[t]he court does not believe that the Governor is entitled to a broad claim of executive privilege on all telephone and calendar records," but that he "may be entitled to executive privilege if [he] can prove that disclosure of particular information will adversely affect [his ability] to effectively carry-out his Constitutional duties." The court also held that the telephone records of Secretary of State John F. Willis were not within

the scope of the court's July opinion and order because the Post had failed to name the Secretary of State as a party.

The Office and the Governor on September 11, 1998, submitted a limited group of records to the Post, including the telephone records from the business line in Mr. Riddick's home, other telephone records at issue with call detail redacted so that only the cost was revealed, and reimbursement receipts for personal calls made by Mr. Riddick and Ms. Smith–Bauk for the six months at issue. They submitted to the court, for *in camera* review, unredacted copies of the telephone and calendar records with proposed redactions highlighted, as well as a memorandum and affidavits in support of those redactions.

On September 15, 1998, the Post filed a motion to unseal the *in camera* explanations for the redactions, and thereafter argument on this motion was heard before the Circuit Court. The court issued its final order on October 23, 1998, in which it held

"that the Defendants, with limited exceptions, have failed to make a particularized showing as to executive privilege, and further have failed to satisfy the statutory burden of demonstrating that the records at issue are exempt from mandatory disclosure under the Maryland Public Information Act."

The court granted the Post's motion to unseal the *in camera* explanations, and ordered that the Office and the Governor produce to the Post "complete and unredacted copies of all of the telephone and calendar records at issue. . . ." Finally, in anticipation of an appeal, the court stayed the execution of the order and retained the records submitted *in camera* for ninety-six hours.

The Office and the Governor immediately filed a notice of appeal and sought a stay of the Circuit Court's judgment. The Court of Special Appeals granted the motion to stay the judgment. Before any further proceedings in the Court of Special Appeals, this Court issued a writ of certiorari. *Office of the Governor v. Washington Post*, 352 Md. 309, 721 A.2d 988 (1998).

## II.

As noted earlier, *supra* note 3, the Maryland Public Information Act in § 10–611(g) defines "public record" as "the original or any copy of any documentary material that: (i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business. . . ." Section 10–613(a) provides that, unless a record is exempted by law, a custodian "shall permit a person . . . to inspect any public record at any reasonable time." Sections 10–615 through 10–619 provide for exemptions and permissible denials.

### A.

A threshold question in this case, raised during the course of questioning by the Court at the initial oral argument, is whether the Act is applicable to the Office of the Governor. This issue had not been raised below and had not been briefed by the parties. As might be expected, however, the defendants suggest that the Act is not applicable and the plaintiff contends that it is fully applicable.[5]

---

5. Maryland Rule 8–131(a) states as follows:

 "**Rule 8–131. Scope of review.**

 (a) **Generally.** The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."
 Nevertheless, because the second sentence of the above-quoted rule begins with the word "[o]rdinarily," both "the Court of Special Appeals and this Court each have 'independent discretion' to excuse the failure of a party to preserve an issue for appellate review." *Moosavi v. State*, 355 Md. 651, 661, 736 A.2d 285, 290 (1999), quoting *Squire v. State*, 280 Md. 132, 134–135, 368 A.2d 1019, 1020 (1977). *See Gindes v. Khan*, 346 Md. 143, 151, 695 A.2d 163, 167 (1997) ("Rule 8–131(a) is not absolute. . . . Under this rule the Court has discretion, which we have exercised on occasion, to consider an issue raised for the first time on appeal").

The Maryland Act, originally enacted and codified in 1970 as Maryland Code (1957, 1975 Repl.Vol.), Art. 76A, §§ 1 through 5, was to some extent modeled after the Federal Freedom of Information Act, 5 U.S.C. § 552, enacted in 1966. The Federal Act has been construed as not applying to the Office of the President. *See Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). By analogy, it was suggested that the State Act should not apply to the Office of the Governor. Because the text and history of the Maryland Act differ from the language and history of the Federal Act in several significant ways, however, we believe that this analogy is flawed.

The records subject to the Federal Act, unlike those subject to the Maryland Act, are "agency records." Although that term was not originally defined in the Federal Act, by amendments to the Act in 1974 "agency" was defined as follows (5 U.S.C. § 552(f)):

> "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."

This section of the Federal Act was construed by the Supreme Court in *Kissinger v. Reporters Committee for Freedom of the Press, supra,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267. In that case, a journalist, William Safire, sought written transcripts of telephone conversations between Henry Kissinger [6] and certain White House officials concerning "leaks," and any calls mentioning Mr. Safire's name. The Supreme Court upheld the denial of the request, holding that, although the

---

Moreover, we shall be remanding this case to the Circuit Court for further proceedings, and the issue of the applicability of the Act to the defendants is a threshold issue of law. Thus, it is the type of issue contemplated by the final clause of Rule 8–131(a). In sum, we shall exercise our discretion to consider the issue.

**6.** Mr. Kissinger was Assistant to the President for National Security Affairs from January 1969 until November 1975, and was Secretary of State from September 1973 until January 20, 1977.

Federal Act includes the "Executive Office of the President" as an agency subject to the Act, it did not apply to the President's immediate assistants and advisers, designated collectively as the Office of the President. The Court reached this conclusion based upon the House Conference Report for § 552(f) of the Federal Act which stated: "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President" are not included within the term "agency." *Kissinger*, 445 U.S. at 156, 100 S.Ct. at 971, 63 L.Ed.2d at 285, quoting H.R.Conf. Rep.No. 93–1380, p. 15 (1974). As Mr. "Safire's request was limited to a period of time in which Kissinger was serving as Assistant to the President," the Court held that the telephone records were not "agency records" at the time they were made. 445 U.S. at 156, 100 S.Ct. at 971, 63 L.Ed.2d at 285.

Although this issue has not been revisited in the Supreme Court, the scope of the Federal statute has been addressed by the United States Court of Appeals for the District of Columbia Circuit. That court has viewed the 1974 amendment to the Federal Act as a codification of its earlier holding in *Soucie v. David,* 448 F.2d 1067 (D.C.Cir.1971). In *Soucie,* the court held that the Office of Science and Technology was an "agency" subject to the Federal Act because it had "substantial independent authority," and, therefore, its "sole function" was not "to advise and assist the President." *Id.* at 1073, 1075. In *Meyer v. Bush,* 981 F.2d 1288, 1297 (D.C.Cir.1993), the court held that President Reagan's Task Force on Regulatory Relief, headed by then Vice President Bush, and composed of several Cabinet members, was not an "agency" subject to the statute because it did not have " 'substantial independent authority.' " *See Rushforth v. Council of Economic Advisers,* 762 F.2d 1038 (D.C.Cir.1985) (Council of Economic Advisers is not an agency subject to Federal Act); *Pacific Legal Found. v. Council on Envtl. Quality,* 636 F.2d 1259 (D.C.Cir.1980) (Council on Environmental Quality is an agency subject to the statute).

The Maryland Act applies to "public records," not "agency records." The coverage of the Act is dependent upon the

scope of the term "public records," and not upon whether the governmental entity holding the records is an "agency" rather than some other type of governmental entity. Although this Court has examined the status of particular entities in order to determine if their records were covered by the Act, such examinations were for the purpose of deciding whether the entities were private or governmental. In each of these cases, the entities argued that they were private and that, for this reason, their records were not "public records" subject to disclosure under the Act. In each case, this Court held that the entities were governmental instrumentalities for purposes of the Act and that, therefore, their records were covered by the Act.

For example, in holding that the Maryland Insurance Guaranty Association was a governmental instrumentality for purposes of the Act, this Court in *A.S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 32, 464 A.2d 1068, 1071 (1983), emphasized that the Act broadly covers any part of Maryland government:

> "The Public Information Act provides that the public is entitled to information regarding the affairs of government.... To that end, the Public Information Act provides that the public has the right to inspect the public records of any branch of the State government.... Moreover, the Public Information Act expressly states that its provisions 'shall be broadly construed in every instance with the view toward public access,'.... Thus, the provisions of the Public Information Act reflect the legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government. Accordingly, in determining whether MIGA is an agency or instrumentality of the State within the scope of the Public Information Act, the language ... must be liberally construed in favor of inclusion in order to effectuate the Public Information Act's broad remedial purpose." (Citations omitted).

And in *Moberly v. Herboldsheimer*, 276 Md. 211, 228, 345 A.2d 855, 864 (1975), interpreting the Public Information Act to

encompass the hospital records of a corporation known as the Memorial Hospital of Cumberland, we concluded:

"If the General Assembly did not intend this interpretation when it enacted this far reaching statute, it should so state."

■ According to § 10–611(g) of the State Government Article, the Maryland Public Information Act applies to "any documentary material that ... is made by a unit or instrumentality of the State government ... or received by the unit or instrumentality in connection with the transaction of public business." Unlike the Federal Act, there is no statutory language or legislative history suggesting that any unit of the Maryland Government is exempt from the Public Information Act's coverage. The grounds for the Supreme Court's interpretation of the Federal Act in *Kissinger v. Reporters Committee for Freedom of the Press, supra,* do not exist with regard to the Maryland Act. On the contrary, the cases interpreting the Maryland Act have broadly construed the terms "public record" and "instrumentality of the State government." The offices of the Governor and his staff in the State House and Shaw House in Annapolis, as well as their offices in Baltimore and Washington, are clearly encompassed by the statutory language "unit or instrumentality of the State government."

## B.

■ There are, however, certain records requested by the Post which, in our view, are not "public records" for purposes of the Public Information Act. They are the records of telephone calls made from telephones in the "Governor's Mansion" or, as it is officially named, "Government House."

As previously discussed, apart from the statute's express exemptions, the coverage of the Maryland Public Information Act is ordinarily dependent upon whether records are those of a "government instrumentality" or are "private." *A.S. Abell Pub. Co. v. Mezzanote, supra,* 297 Md. at 30–31, 464 A.2d at 1070; *Moberly v. Herboldsheimer, supra,* 276 Md. 211, 345 A.2d 855. Moreover, "there is no single test for determining

whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose," and "[a]ll aspects of the interrelationship between the State and the ... entity must be examined," *Mezzanote,* 297 Md. at 35, 464 A.2d at 1072.

It seems obvious that bills or records of telephone calls, made by a government official or members of the official's family from their personal telephones in the family's private home, would not be considered "public records" within the meaning of the Act. In light of one's reasonable expectation of privacy in his or her own home, such records would be "private."

Article II, § 21, of the Constitution of Maryland provides in pertinent part that "[t]he Governor shall reside at the seat of government...."[7] The State, in the implementation of this provision, provides a home, named "Government House," for the Governor and his family in the City of Annapolis. *See* Code (1984, 1999 Repl.Vol.), §§ 9–601 through 9–606 of the State Government Article (relating to the Government House Trust).

In light of the nature of Government House and the role of the Government House Trust, the Governor and his family might not have the identical expectations of privacy while living there as one has in his or her privately owned home. Nonetheless, we do not believe that the Governor and his family must relinquish all normal expectations of privacy in their home simply because, in accordance with constitutional and statutory provisions, their home and furnishings, including telephone service, are supplied by the State.

Unlike Chief of Staff Riddick, the Governor does not have a designated "business line" in Government House. The record in this case discloses that, with regard to the telephone bills for calls made from Government House, it would be almost

---

**7.** For an account of the history and purpose of this provision, *see Gallagher v. Bd. of Sup'rs of Elections,* 219 Md. 192, 202–203, 148 A.2d 390, 396 (1959).

impossible to determine which member of the family made particular calls or, even if it could be determined that a particular call was made by the Governor, whether it was personal or related to state business.

We do not believe that the General Assembly, in defining "public record" as a record "made by a unit or instrumentality of the State government" (§ 10–611(g)), intended to include the home telephone bills of the Governor and his family. Consequently, records of calls from telephones in Government House are not covered by the Act and need not be disclosed.[8]

### III.

Before addressing the defendants' principal arguments that the records sought by the Post fall within the Public Information Act's exemptions, we can dispose of some matters based on availability and the scope of the Post's requests.

The Post requested the telephone records of the Governor, Mr. Riddick, and Ms. Smith–Bauk from telephones in

---

**8.** The defendants in the Circuit Court also "identified for redaction all personal calls placed by any one of the three officials at issue from their office locations," arguing that because a personal "call does not involve State business, the record of the call should not be considered a public record" (petitioners' brief at 46–47). We do not agree totally. Although the content of such calls may be private, the bill from a telephone company to the State, for calls made from state offices by state officials or employees on state telephones during their working hours, clearly falls within the definition of "public record" in the Act. It is a document received by a unit of government, and, in our view, it is "in connection with the transaction of public business." Although employees must occasionally make personal telephone calls from their employers' phones during working hours, the frequency of and the amount of time spent on such calls is clearly a matter of legitimate concern to the employer. This is true regardless of whether there exists a reimbursement record. The taxpayers and citizens of Maryland, as the employers of state officials and employees, have a legitimate interest in the frequency and length of personal telephone calls made on state office telephones. That interest may be vindicated, however, by disclosure of the aggregated totals of time spent and charges incurred on calls devoted to personal business versus public business. Thus, absent evidence of abuse, this degree of disclosure would be sufficient.

the State House and the Shaw House, which are both in Annapolis, from telephones in the Washington and Baltimore offices of the Governor, and from any cellular telephones used by these three individuals. The defendants produced in the Circuit Court a detailed account of the telephone system employed by the State, and the limitations of that system. In reviewing the record, we conclude that the Circuit Court should have excluded certain documents, or portions of documents, from disclosure based upon the unavailability of the documents or the Post's own limitations on the scope of its requests.

### A.

The first group of these documents consists of the telephone records from offices outside of the State House.

The telephone system in use in the Baltimore office, known as the "PBX system," includes a "collection device" which records all incoming and outgoing local and long distance calls to and from that office. The only other telephone records from the Baltimore office are the bills from the long distance service provider, documenting only outgoing long distance charges. The petitioners produced several affidavits in the Circuit Court stating that, although the "external" long distance bills have been retained, the "internal" information collected by the PBX system is no longer available.

■ Louis LaRicci, the Deputy Director of the Division of Telecommunications in the Office of Information Technology within the Department of Budget and Management, stated in his affidavit that the billing information for the Governor's Baltimore office, for the period from February 1, 1996, to July 31, 1996, "was disposed of in the ordinary course of the Division's business." Carol Cordial, the Assistant Director of the Division of Telecommunications, stated in her affidavit that the telephone records for the Baltimore office are "written over automatically by the system" every twelve months and that, therefore, "nc internal data currently is retained" for that office. The Post has not disputed these statements. The

internal billing information from the Baltimore office is unavailable. Obviously, a custodian cannot properly be ordered to produce records under the Act when those records simply do not exist.

 ■ Although the long distance bills for the Baltimore office are currently in the possession of the Division of Telecommunications, they also need not be produced. The Post's request was limited to the telephone records of the Governor, Ms. Smith–Bauk, and Mr. Riddick. The bills from the long distance service provider for the Baltimore office indicate only the line from which the calls originated and the number to which the calls were placed. They do not indicate who placed each call. Moreover, the record shows that the Governor, Mr. Riddick, and Ms. Smith–Bauk were rarely in the Baltimore office during the time period in question. As Mr. Riddick stated in his affidavit, "I did not work in that office any more than a few times each month during the six months at issue." Ms. Smith–Bauk stated that she "did not often use ... [the office] or the telephones there." The three officials' possible use of the telephones in the Baltimore office during the time period in question, to make long distance calls, is far too speculative for treating the bills as telephone records of the Governor, Ms. Smith–Bauk, and Mr. Riddick. Accordingly, the long distance telephone bills for the Baltimore office are beyond the scope of the Post's request for telephone records.

 ■ For the same reason, the telephone records of calls originating in Shaw House and the Washington, D.C., office are beyond the scope of the telephone records request. The record clearly shows that none of the three officials have either offices or designated telephone lines at these locations. In addition, Chief of Staff Riddick stated in his affidavit that "I cannot recall if I ever was in the Washington office from February through July 1996, and I certainly was not there with any regularity." Ms. Smith–Bauk said essentially the same thing in her affidavit. The record is clear that the use of the telephones in both Shaw House and the Washington office by the three officials would have been rare, if it occurred at

all, during the period in question. Consequently, the request for telephone billing records from these locations should also have been denied.

### B.

The telephone records from the State House are numerous and complex. These records document only long distance calls. Carol Cordial, the Assistant Director of the Division of Telecommunications, explained this system in detail in her affidavit. To summarize, the offices of the Governor and Ms. Smith–Bauk are located within the same suite of offices, which is served by eighteen separate telephone lines. Five other people work in that suite and use the telephones. Because use of the different telephone instruments within the entire suite is not restricted, anyone within the suite can use any one of the instruments and, therefore, could access all eighteen lines. As a result, the telephone bills reveal the lines from which individual calls are made but do not, and cannot, reveal who placed each call. Mr. Riddick's office, which is located in a separate suite, is also served by numerous telephone lines (seven in all), which can be accessed on separate instruments. Three assistants to Mr. Riddick also work in this suite and use the telephones. Again, the records from Mr. Riddick's office do not reveal who placed the individual calls.

To repeat, the Post's telephone records request was limited to the calls of the Governor, Mr. Riddick, and Ms. Smith–Bauk. Based on the scope of the request as well as the uncontradicted evidence, we believe that the trial court erred by not limiting the number of telephone lines at issue in the State House. Although it is difficult to determine who placed each call listed on the voluminous telephone bills, the lines at issue can be limited based upon the individual to whom the specific lines were assigned, and by whom they were most easily accessed and most frequently used. The Governor could access five lines directly from his immediate office, and Ms. Smith–Bauk could access six lines directly from her office (three of which were the same as three of the lines that the Governor could access). Finally, Mr. Riddick could access six

lines from his office. Fourteen lines in all, they were designated in the record below as lines A, B, C, D, E, N, O, P, S, U, V, W, X, and Y. These are the lines from which it is reasonable to conclude that the three officials made most, if not all, of their calls while in the State House.

■ Therefore, we have limited the telephone records at issue to: (1) the fourteen lines from the State House as designated above, and (2) the cellular telephones assigned to the Governor, Ms. Smith–Bauk, and Mr. Riddick. These records are available and are, generally, within the scope of the Post's request. Nevertheless, redactions within these records would seem to be in order because some individual entries appear to be beyond the scope of the Post's request.

## C.

In the records and documents submitted to the Circuit Court for *in camera* review, several items were designated as "Other Persons' Calls," meaning that they were made by persons other than the Governor, Ms. Smith–Bauk, and Mr. Riddick. Kelly Derthick, Executive Assistant to the Governor, Jennifer Crawford, Special Assistant to the Governor, and Anne Budowski, Senior Assistant to Chief of Staff Riddick, stated in their affidavits that they reviewed the telephone records from the State House and that they identified calls which they made themselves or which were placed by staff members other than the three officials. Ms. Budowski and Andrea Leahy–Fucheck, then Legal Counsel to the Governor, also stated in their affidavits that they reviewed the schedules of the Governor and the Chief of Staff and were able to identify time periods during which the two officials were out of the office and therefore could not have placed telephone calls. All of these calls were specifically identified and placed within the "Other Persons' Calls" category in the material submitted to the trial court *in camera*. Unless, upon remand, the Circuit Court believes that it needs further information regarding the source of these calls, they would seem to be beyond the scope of the Post's request and should be redacted.

The material submitted to the Circuit Court *in camera* also categorized individual calls placed on the cellular phones assigned to the Governor, Ms. Smith–Bauk, and Mr. Riddick. Similar to the calls identified as being made by "other persons" in the State House, calls from the three cellular phones assigned to the Governor were frequently made by the Maryland State Police troopers in the Executive Protection Unit and did not involve conversations of the Governor. Captain Gary Shields, Commander of the Executive Protection Unit, stated in his affidavit that he reviewed the bills from the Governor's three cellular phones and, "[b]ased on the identification of the numbers called, the length of the calls, and their relationship to other calls," he was "reasonably certain" that calls categorized in the "In Camera Schedule" under the heading "Executive Protection Unit" were calls by the troopers and not by the Governor. Again, unless the trial court on remand believes that it needs more information, these calls appear to be beyond the scope of the Post's request and should be redacted from the records.

### D.

As noted earlier, *supra* note 4, the Governor's scheduling records include wholly personal meetings and family engagements. The defendants argue that such records should be exempt from disclosure. According to the Post's brief in this Court, "[t]he Post advised the Circuit Court that it would not object to the redaction of calendar items corresponding to family events … so long as there was a proper evidentiary showing supporting such redactions." (Respondent's brief at 45, n.29). The Circuit Court made no specific ruling that the defendants' evidentiary showing in this regard was insufficient. Upon remand, unless the trial court desires more evidence that a particular calendar item is entirely personal or family, these items should be redacted based on the Post's representation.

### IV.

We next address the defendants' arguments that various portions of the records fall within specific Public Information

Act exemptions in §§ 10–616(d) and (i) (letters of reference and personnel records), 10–617(d) (commercial information), 10–617(e) (home addresses and telephone numbers of state or local government employees), and 10–618(b) (interagency or intra-agency letters or memoranda).[9]

### A.

 Preliminarily, however, it would be useful to underscore certain well-established general principles governing the interpretation and application of the Maryland Public Information Act. This Court recently reiterated in *Kirwan v. The Diamondback*, 352 Md. 74, 80–81, 721 A.2d 196, 199 (1998), that

"[t]he Maryland Public Information Act establishes a public policy and a general presumption in favor of disclosure of government or public documents. The statute thus provides (§ 10–612(a) and (b) of the State Government Article):

'(a) *General Right to information.*—All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

(b) *General construction.*—To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result, this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay ·to the person or governmental unit that requests the inspection.' "

Accordingly, as we pointed out in *Kirwan*, 352 Md. at 84, 721 A.2d at 200, "the statute should be interpreted to favor disclosure." *See also, e.g., Office of the Attorney General v.*

---

9. In the Circuit Court, in their motion for summary judgment, the defendants also relied upon the exemption for "financial information" in § 10–617(f). They have not relied upon this exemption on appeal and thus have abandoned any argument based on § 10–617(f). With regard to the meaning and scope of the "financial information" exemption, *see Kirwan v. The Diamondback*, 352 Md. 74, 84–87, 721 A.2d 196, 201–202 (1998).

*Gallagher,* 359 Md. 341, 343, 753 A.2d 1036, 1037 (2000) ("the Act is to be construed in favor of disclosure"); *Office of State Prosecutor v. Judicial Watch, Inc.,* 356 Md. 118, 134, 737 A.2d 592, 601 (1999) ("It is the policy of this State that its citizens have 'access to information about the affairs of government' "); *Fioretti v. Maryland State Board of Dental Examiners,* 351 Md. 66, 73, 716 A.2d 258, 262 (1998) (the statute embodies the principle that citizens " 'be accorded wide-ranging access to public information' "); *Mayor and City Council of Baltimore v. Maryland Committee Against the Gun Ban,* 329 Md. 78, 80–81, 617 A.2d 1040, 1041 (1993); *Cranford v. Montgomery County,* 300 Md. 759, 771, 481 A.2d 221, 227 (1984) ("Without doubt the bias of the Md. Act is toward disclosure"); *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506–507, 474 A.2d 880, 887 (1984); *A.S. Abell Publishing Co. v. Mezzanote, supra,* 297 Md. at 32, 464 A.2d at 1071; *Superintendent v. Henschen,* 279 Md. 468, 473, 369 A.2d 558, 561 (1977); *Haigley v. Dept. of Health,* 128 Md.App. 194, 226–227, 736 A.2d 1185, 1201–1202 (1999). Concomitantly, "courts must interpret the exemptions narrowly," *Fioretti v. Board of Dental Examiners, supra,* 351 Md. at 77, 716 A.2d at 264.

Moreover, "the public agency involved bears the burden in sustaining its denial of the inspection of public records." *Fioretti,* 351 Md. at 78, 716 A.2d at 264. *See Cranford v. Montgomery County, supra,* 300 Md. at 771, 481 A.2d at 227 ("The custodian who withholds public documents carries the burden of justifying nondisclosure"). An *in camera* inspection by the trial court, while not always necessary, may in some cases be "needed in order to make a responsible determination on claims of exemptions." *Cranford,* 300 Md. at 779, 481 A.2d at 231. In addition, if parts of a record are exempt but other parts can be revealed, the Act favors severability. *See* § 10–614(b)(3)(iii); *Cranford,* 300 Md. at 774, 481 A.2d at 228–229.

B.

In the material submitted to the Circuit Court for *in camera* review, the defendants identified certain appointment

or scheduling records and telephone records which, they claimed, fell within the Act's exemptions set forth in §§ 10–616(d) and (i). Section 10–616 provides in pertinent part as follows:

"(a) *In general.*—Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section.

* * *

"(d) *Letters of reference.*—A custodian shall deny inspection of a letter of reference.

* * *

"(i) *Personnel records.*—(1) Subject to paragraph (2) of this subsection, a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information.

(2) A custodian shall permit inspection by:

(i) the person in interest; or

(ii) an elected or appointed official who supervises the work of the individual."

The telephone records which allegedly fell within the above-quoted exemptions were described as "Call to _____ re personnel matter" or "Call to _____ re appointments" or "Call to _____ re judicial appointments." [10] The appointment records, typically, would include the date and then read as follows: "2:30 pm—3:00 pm _____ interview [Govs offc]" or "3:30—4:30 pm _____ re: Green Bag appointments @ Govs offc," or "11:00 a.m.—11:15 a.m. Interview, _____, _____ County District Court [Gov's offc.] *Andrea," or "1:30 pm—2:15 pm Interview w _____ for _____ [Govs offc] *Judi." [11]

---

**10.** The material submitted to the Circuit Court for *in camera* review actually identified the recipients where we have employed blanks.

**11.** Again, the material submitted to the court below *in camera* actually identified the person with whom the Governor was meeting and the particular position involved.

The defendants' argument, that the above-described types of records should have been redacted pursuant to § 10–616(d) and (i), finds no support in the plain language of the statute or the cases applying the "personnel records" exemption.

 Clearly, none of the above-described records constitutes a "letter of reference." When the Governor telephones or meets with someone for the purpose of obtaining information about a prospective appointee, a record, memorandum, or notes of the substance of their conversation might arguably fall within the exemption for a "letter of reference" if the exemption is not given a strict literal interpretation. But the mere fact that the Governor, or one of his staff, telephoned or met with an identified person to obtain information about a prospective appointee is certainly not "a letter of reference."

With regard to the "personnel records" exemption, this Court in *Kirwan,* 352 Md. at 82–83, 721 A.2d at 200, stated:

"The term 'personnel record' is not expressly defined in the statute. Nonetheless, the language of subsection (i) discloses what type of documents the Legislature considered to be personnel records. The statute lists three categories of documents which are: (1) an application for employment; (2) performance rating; and (3) scholastic achievement. Although this list was probably not intended to be exhaustive, it does reflect a legislative intent that 'personnel records' mean those documents that directly pertain to employment and an employee's ability to perform a job."

The Court went on in *Kirwan* to point out that records which "do not relate to [the employee's] hiring, discipline, promotion, dismissal, or any matter involving his status as an employee .... do not fit within the commonly understood meaning of the term 'personnel records.' " 352 Md. at 83, 721 A.2d at 200.

We concluded in the *Kirwan* opinion by stating that, in light of the Act's policy favoring disclosure, the General Assembly did not intend "that *any* record identifying an employee would be exempt from disclosure as a personnel record." 352 Md. at 84, 721 A.2d at 200.

The identification of the telephone number which the Governor or a member of his staff called, or the identification of someone with whom the Governor met, concerning a possible future appointment to a judgeship or position in the executive branch of state government, would not amount to a "personnel record" as defined in *Kirwan*. The simple record of what number was called, or with whom the Governor met, about possible *future* employment would not relate to the discipline, promotion, dismissal, status, job performance, or achievement of an existing or former employee. Again, while the substance of the conversations might in some cases fall in the category of "application for employment" or relate to "hiring," the fact that the Governor or a staff member telephoned or met with an identified individual would not be a "personnel record" under any "commonly understood meaning of the term," *Kirwan*, 352 Md. at 83, 721 A.2d at 200.

## C.

Section 10–617(d) of the Public Information Act states in relevant part as follows:

"(d) *Commercial information.*—A custodian shall deny inspection of the part of a public record that contains any of the following information provided by or obtained from any person or governmental unit:

(1) a trade secret;

(2) confidential commercial information...."

The defendants argue that the affidavits of the Governor and Chief of Staff Riddick identified specific telephone calls which involved "economic development projects," or "sensitive and confidential negotiations over" such economic development projects, or "confidential efforts to resolve a strike in Maryland," or "sensitive discussions relating to a major public transportation project." (Petitioners' brief at 47–48). The defendants maintain that "the circuit court should have found those calls to be exempt from disclosure under ... the specific statutory exemption for confidential commercial information ... [in] § 10–617(d)." (*Id.* at 47).

 Again, while records, memoranda, or notes of what was said during these conversations might amount to "confidential commercial information," the fact that the Governor or Mr. Riddick made a telephone call to a particular number is not itself, standing alone, "commercial" information. In order to so qualify, the defendants would need to explain, for *in camera* consideration by the court, why the record of each such allegedly sensitive telephone call, if turned over to the Post, would place the Post in the position of potentially jeopardizing government projects or negotiations at critical stages of development. When the trial court, on remand, reconsiders any exemption claimed under § 10–617(d), as now asserted or as amplified on remand, it may consider in the balancing test how the staleness that now inheres by virtue of the passage of time affects the "confidential" nature of any assertedly protected information.

### D.

 The Public Information Act in § 10–617(e) provides:

"(e) *Public employees.*—Subject to § 21–504 of the State Personnel and Pensions Article, a custodian shall deny inspection of the part of a public record that contains the home address or telephone number of an employee of a unit or instrumentality of the State or of a political subdivision unless:

(1) the employee gives permission for the inspection; or

(2) the unit or instrumentality that employs the individual determines that inspection is needed to protect the public interest."

The defendants assert that, in the Circuit Court, they "specifically identified 94 telephone calls to State employees at home where the telephone records thus list the employee's home telephone number. * * * [Defendants] did not argue for complete redaction of those calls; they argued only that the employees' home telephone numbers must be redacted, leaving all other data about the calls." (Petitioners' brief at 49).

The Post counters that the defendants "failed to present the court with any evidentiary support for the claim—which, at a minimum, would have needed to include the names of the alleged employees whose numbers were being withheld, so that the validity of the proposed redactions could be tested." (Respondents' brief at 43, n.26).

The record discloses that affidavits by the Governor's Legal Counsel and by the Senior Assistant to Chief of Staff Riddick, submitted in connection with the defendants' motion for summary judgment, stated, either as a matter of the affiants' personal knowledge or of the knowledge of other staff members with whom they spoke, that the descriptions of various categories, including the category of employees' home telephone numbers, were accurate. The trial judge did not specifically find that the evidence was insufficient to show that the 94 numbers were home telephone numbers of state employees.

With two exceptions which are inapplicable here, the statute flatly exempts from disclosure the home telephone numbers of state or local government employees. The only evidence submitted to the trial court indicates that the 94 numbers called were in fact home telephone numbers of state government employees. On remand these numbers should be redacted unless the trial court concludes that it needs more information. In this connection, we point out that, if the trial court requires the submission of the state employees' names in order to verify that the numbers are in fact telephone numbers of state employees, such submission should be *in camera*. It would largely defeat the exemption for public employees' home telephone numbers if their names were made public, thereby allowing anyone to look up their telephone numbers in a telephone directory. Under these circumstances, the exemption would effectively apply only to public employees with unlisted home telephone numbers. This would obviously not be consistent with the Legislature's intent.

### E.

Section 10–618 of the Maryland Public Information Act gives a custodian discretion to deny inspection of parts of

specified categories of public records if the custodian believes that such inspection would be contrary to the public interest. One of those categories consists of "interagency or intra-agency letter[s] or memorand[a]." Thus, § 10–618(a) and (b) state as follows:

" § 10–618. **Permissible denials.**

(a) *In general.*—Unless otherwise provided by law, if a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of that part, as provided in this section.

(b) *Interagency and intra-agency documents.*—A custodian may deny inspection of any part of an interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the unit."

\* \* \*

This permissible exemption for interagency and intra-agency letters or memoranda to some extent reflects that part of the executive privilege doctrine encompassing letters, memoranda or similar internal government documents containing confidential opinions, deliberations, advice or recommendations from one governmental employee or official to another official for the purpose of assisting the latter official in the decision-making function. *Cranford v. Montgomery County, supra,* 300 Md. at 772–774, 481 A.2d at 227–228. *See also Hamilton, Superintendent v. Verdow, supra,* 287 Md. at 553–562, 414 A.2d at 920–924.

We shall later, in Part V of this opinion, consider whether any of the telephone and scheduling records might be exempt from disclosure under the doctrine of executive privilege and § 10–615(1) of the Maryland Public Information Act. Regardless of whether some of the records might be exempt as "privileged" material under § 10–615(1), however, it seems obvious that a bill from a telephone company or a simple scheduling record does not constitute "an interagency or intra-agency letter or memorandum" under § 10–618(b).

Preliminarily, a bill from a telephone company is not created by any governmental agency or unit. Under the language of the federal Freedom of Information Act, 5 U.S.C. § 552(b)(5), which contains an exemption for interagency or intra-agency memoranda or letters and which is worded the same as § 10–618(b) of the Maryland Act, the courts have held that the exemption is limited to documents created by government agencies or agents, or by outside consultants called upon by a government agency "to assist it in internal decisionmaking." *County of Madison v. United States Dep't of Justice*, 641 F.2d 1036, 1040 (1st Cir.1981). *See, e.g., Van Bourg, Allen, Weinberg & Roger v. NLRB*, 751 F.2d 982, 985 (9th Cir.1985) ("exemption 5 by its terms applies only to internal agency documents or documents prepared by outsiders who have a formal relationship with the agency," and does not apply to affidavits submitted to the NLRB by private parties in the course of an investigation); *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir.1980); *Wu v. National Endowment for Humanities*, 460 F.2d 1030 (5th Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1352, 35 L.Ed.2d 586 (1973). A bill from a telephone service provider, charging for the listed telephone calls made, is not a document from a government agency or agency consultant employed to assist the agency in its decision-making function.

Moreover, bills from telephone companies and simple listings of the persons who have appointments with the Governor are not, under any ordinary meaning of the statutory language, letters or memoranda. For example, in *Times Mirror Co. v. Superior Court*, 53 Cal.3d 1325, 283 Cal.Rptr. 893, 813 P.2d 240 (1991), the Supreme Court of California construed, *inter alia*, an exemption from disclosure in the California Public Records Act for "Correspondence of and to the Governor or employees of the Governor's office." 53 Cal.3d at 1336–1337, 283 Cal.Rptr. at 893–894, 813 P.2d at 246. The Court rejected the Governor's argument that "his calendars and schedules" constituted correspondence within the meaning of the exemption, pointing out that "correspondence" means "communication by letters." 53 Cal.3rd at 1337, 283 Cal.Rptr.

at 900, 813 P.2d at 247.[12] *Cf. Taylor v. Worrell Enterprises,* 242 Va. 219, 409 S.E.2d 136 (1991) (dissenting opinion of three justices took the position that telephone records of the Governor's office did not constitute "memoranda, working papers and correspondence" within an exemption in the Virginia Freedom of Information Act; one justice, in a concurring opinion, took the position that the records were within the exemption; three other justices, in the plurality opinion, based their decision on state constitutional grounds).

As discussed by this Court in *Cranford v. Montgomery County, supra,* 300 Md. at 771–776, 481 A.2d at 227–229, only certain types of letters and memoranda fall within the exemption in § 10–618(b). As a threshold matter, however, to come within the exemption a document must be an "inter-agency or intra-agency letter or memorandum." Even if those terms are given a broad scope, the telephone bills and scheduling records here involved fail to meet this threshold test.

### F.

Finally, the defendants rely on some cases from other jurisdictions which are based on statutory language or exemptions which are different from the language and exemptions of the Maryland Public Information Act.

A principal case relied on by the defendants is *Times Mirror Co. v. Superior Court, supra,* 53 Cal.3d 1325, 283 Cal.Rptr. 893, 813 P.2d 240. As pointed out by the Supreme Court of California in that opinion, the California Public Records Act contains "a 'catchall' exemption that permits the government agency to withhold a record if it can demonstrate that ' . . . *the public interest served by not making the record public clearly outweighs the public interest served by disclosure of the record.'* " 53 Cal.3d at 1338, 283 Cal.Rptr. at 895, 813 P.2d at 247–248, emphasis in original. The Supreme

---

**12.** As discussed later, the Supreme Court of California in the *Times Mirror* case did hold that the Governor's calendars and schedules were exempt from disclosure under a different exemption in the California statute.

Court of California decided that the Governor's "calendars and schedules" fell within this exemption, holding "that the public interest served by not disclosing the Governor's appointment calendars and schedules clearly and substantially outweighs the public interest in their disclosure." 53 Cal.3d at 1347, 283 Cal.Rptr. at 907, 813 P.2d at 254. *See also Courier–Journal v. Jones,* 895 S.W.2d 6 (Ky.App.1995), adopting the holding of the *Times Mirror* case in this regard.

Nevertheless, as the defendants acknowledge, the Maryland Public Information Act does not contain a general "catchall" public interest exemption. Instead, for a record to be exempt from disclosure because of the "public interest," it must fall within one of the specific categories set forth in § 10–618. *See Kirwan v. The Diamondback, supra,* 352 Md. at 87–88, 721 A.2d at 202–203; *Cranford v. Montgomery County, supra,* 300 Md. at 770, 481 A.2d at 226–227. The records at issue in the present case fall within none of the categories delineated in § 10–618.[13]

The defendants also rely on *Bureau of Nat. Affairs v. U.S. Dept. of Justice,* 742 F.2d 1484, 1496 (D.C.Cir.1984), in which the court held that government officials' telephone message slips and certain appointment calendars that "were not *distributed* to other employees, but were retained solely for the convenience of the individual officials," did not constitute "agency records" within the meaning of the federal Freedom of Information Act. The court also held that "daily agendas," indicating the schedule of the head of the Department of Justice's Antitrust Division, which was circulated to certain members of his staff, were "agency records" and were disclosable. 742 F.2d at 1495. *See also Washington Post v. U.S.*

---

**13.** There is also a provision in the Maryland Act, in § 10–619, authorizing a temporary denial of inspection based on "substantial injury to the public interest." Section 10–619 specifies a particular procedure which must be followed by the custodian who temporarily denies inspection based on the public interest. Section 10–619 was not invoked in the present case, and the defendants do not rely upon that section. *See Cranford v. Montgomery County, supra,* 300 Md. at 776, 481 A.2d at 229–230.

*Dept. of State,* 632 F.Supp. 607 (D.D.C.1986) (records of the Secretary of State's schedule are "agency records" and disclosable under the federal statute).

The records which were held to be nondisclosable in the *Bureau of Nat. Affairs* case are dissimilar from the records involved in the case at bar. We do not have before us telephone message slips or an official's appointment calendar which is not distributed to any other employees, and we express no opinion as to the disclosability of such material under Maryland law. In addition, the records held to be disclosable in the *Bureau of Nat. Affairs* case appear to be similar to the Governor's scheduling records involved in the present case.

Nonetheless, the precise statutory issue in the *Bureau of Nat. Affairs* case, namely whether certain documents made by a governmental unit constitute "agency records," does not arise under the Maryland Act. As discussed in Part II A of this opinion, *supra,* the federal statute applies only to "agency records." In light of the legislative history underlying this term and the case law construing it, not all records made by or received by a federal governmental unit or instrumentality constitute "agency records." The Maryland Act, on the other hand, uses the term "public record" which includes "*any* documentary material" which is "made by a unit or instrumentality" of the government and "is in *any* form . . . ." (Emphasis added). Consequently, cases deciding whether governmental documents are "agency records" within the meaning of the federal statute are not very pertinent in determining whether a governmental document is disclosable under the Maryland Public Information Act.

The defendants argue that the "privacy interests" of the public officials and the persons called would be invaded by a disclosure of the Governor's office telephone records, and they cite, *inter alia,* the New Jersey Superior Court's opinion in *North Jersey Newspaper Co. v. Passaic County Bd. of Chosen Freeholders,* 245 N.J.Super. 113, 584 A.2d 275 (1990), *modified and remanded for further proceedings, North Jersey Newspa-*

*pers Co. v. Passaic County Bd. of Chosen Freeholders,* 127 N.J. 9, 601 A.2d 693 (1992). The Superior Court in that case held that telephone billing records of public officials were public records under the New Jersey "Right–To–Know Law" but that they were exempt from disclosure because of "the privacy interests of elected officials in the telephone calls they make while performing their public duties...." 245 N.J.Super. at 121, 584 A.2d at 279. The Supreme Court of New Jersey, however, in modifying and remanding the case, held that the New Jersey "Right–To–Know Law" gave a right of access only to records "'required by law to be made, maintained or kept,'" and that telephone bills did not fall within such category. 127 N.J. at 13–14, 601 A.2d at 695. The Maryland Public Information Act is not limited to public records which are required by law to be made, maintained, or kept, and thus the ultimate holding in the *North Jersey Newspapers* case has little relevance in cases under the Maryland Act. Furthermore, unlike the public information acts in some states, "the Maryland Public Information Act does not contain an exemption for particular cases whenever the disclosure of a record might cause an 'unwarranted invasion of privacy.'" *Kirwan v. The Diamondback, supra,* 352 Md. at 89, 721 A.2d at 203.

## V.

Section 10–615(1) of the Maryland Public Information Act, as previously noted, *supra* note 2, requires a custodian of a public record to deny inspection if "by law the record is privileged...."[14] This Court has recognized that certain

---

14. Section 10–615 in its entirety states:

"§ **10–615. Required denials—In general.**
A custodian shall deny inspection of a public record or any part of a public record if:
(1) by law, the public record is privileged or confidential; or
(2) the inspection would be contrary to:
(i) a State statute;
(ii) a federal statute or a regulation that is issued under the statute and has the force of law.
(iii) the rules adopted by the Court of Appeals; or

governmental documents need not be disclosed under the doctrine commonly known as "executive privilege" which is part of Maryland common law and which, to some extent, is rooted in the separation of powers principle set forth in Article 8 of the Maryland Declaration of Rights.[15] *Hamilton, Superintendent v. Verdow, supra,* 287 Md. at 553–562, 414 A.2d at 920–924. *See also Porter Hayden v. Bullinger,* 350 Md. 452, 461, 713 A.2d 962, 966 (1998); *Philip Morris v. Glendening,* 349 Md. 660, 678, 709 A.2d 1230, 1239 (1998); *Cranford v. Montgomery County, supra,* 300 Md. at 773–774, 481 A.2d at 228–229.[16] Consequently, if the records here at issue, or any part of them, are non-disclosable under the executive privilege doctrine, then such records or parts of records are exempt from disclosure under § 10–615(1) of the Maryland Public Information Act.

The doctrine of executive privilege, in addition to protecting military and diplomatic secrets, is chiefly designed to protect confidential advisory and deliberative communications to government officials. This Court in the *Hamilton* case thus explained (287 Md. at 558, 414 A.2d at 922):

---

(iv) an order of a court of record."

**15.** Article 8 of the Maryland Declaration of Rights provides:

"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

**16.** As pointed out in *Hamilton, Superintendent v. Verdow, supra,* 287 Md. at 553–554 n. 3, 414 A.2d at 920 n. 3, the name "executive privilege" is "an overly narrow term, because the privilege extends beyond the executive branch of government. As it has roots in the constitutional doctrine of separation of powers, a similar privilege extends to the judicial and legislative branches as well."

The *Hamilton* case, as well as the *Cranford* case, 300 Md. at 772, 481 A.2d at 227–228, also pointed out that the same overall privilege has gone by other names, such as the privilege for "governmental secrets," the "state secret" privilege, the "official information" privilege, the "deliberative process" privilege, the "pre-decisional" privilege, etc. Nevertheless, the term "executive privilege" seems to be the one most often used by lawyers and courts.

"The necessity for some protection from disclosure clearly extends to confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action. A fundamental part of the decisional process is the analysis of different options and alternatives. Advisory communications, from a subordinate to a governmental officer, which examine and analyze these choices, are often essential to this process. The making of candid communications by the subordinate may well be hampered if their contents are expected to become public knowledge."

After reviewing cases in the United States Supreme Court and other courts, we pointed out in *Hamilton* that

"the cases throughout the country, both federal and state, have recognized the doctrine of executive privilege which, in addition to state and military secrets, gives a measure of protection to the deliberative and mental processes of decision-makers." 287 Md. at 561, 414 A.2d at 924.

The Court went on in *Hamilton* to hold that the privilege "is for the benefit of the public and not the governmental officials who claim the privilege" (287 Md. at 563, 414 A.2d at 924), that the privilege is not absolute, and that in "many situations the courts have engaged in a balancing process, weighing the need for confidentiality against the ... need for disclosure and the impact of nondisclosure upon the fair administration of justice." 287 Md. at 563, 414 A.2d at 925. We also held in *Hamilton* that when a government official makes a formal claim ·of executive privilege for confidential communications "of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure." *Ibid.*

Turning to factual documents as opposed to documents of an advisory or deliberative nature, we held in *Hamilton* that "[o]rdinarily, 'memoranda consisting only of compiled factual material'" are disclosable, 287 Md. at 564, 414 A.2d at 925, quoting *EPA v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35

L.Ed.2d 119, 132 (1973). We recognized in *Hamilton,* 287 Md. at 564–565, 414 A.2d at 925–926, however, that

"material cannot always 'easily be separated into fact finding and decision making categories,' *Boeing Airplane Company v. Coggeshall, supra,* 280 F.2d at 662. Moreover, some factual material is entitled to a degree of protection under the privilege, although not to the same extent as opinions and recommendations. This would include facts obtained upon promises or understandings of confidentiality, investigative facts underlying and intertwined with opinions and advice, and facts the disclosure of which would impinge on the deliberative process. *See, e.g.,* (relating to one type or another of such factual material): *EPA v. Mink, supra,* 410 U.S. at 92, 93 S.Ct. at 838; *Mead Data Cent., Inc. v. U.S. Dept. of Air Force,* 566 F.2d 242, 256–257, 260 (D.C.Cir.1977); *Brockway v. Department of Air Force,* 518 F.2d 1184, 1191–1194 (8th Cir.1975); *Montrose Chemical Corporation of California v. Train,* 491 F.2d 63, 66–71 (D.C.Cir.1974); *J.H. Rutter Rex Manufacturing Co., Inc. v. N.L.R.B.,* 473 F.2d 223, 234–235 (5th Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); *Freeman v. Seligson,* 405 F.2d 1326, 1339–1340 (D.C.Cir.1968); *Machin v. Zuckert, supra,* [114 U.S.App.D.C. 335] 316 F.2d [336] at 339–340 [(1963)]; *Rabbitt v. Department of Air Force,* 401 F.Supp. 1206, 1209 (S.D.N.Y.1974). In these situations, the government's asserted reasons for nondisclosure are weighed against the litigant's need for discovery in light of the particular circumstances of each case. *Frankenhauser v. Rizzo,* 59 F.R.D. 339, 342–346 (E.D.Pa.1973); *O'Keefe v. Boeing Company, supra,* 38 F.R.D. [329] at 334–336 [(S.D.N.Y.1965)]."

*See also In re Sealed Case,* 121 F.3d 729, 746–758 (D.C.Cir. 1997).

Although we noted, *supra* Part IV F, a distinction between the statutory exception we construe here and the California statutory exemption interpreted by the California Supreme Court in *Times–Mirror Co. v. Superior Court,* the California Court's general observations regarding an analytical approach

when considering assertions of executive privilege as to purely factual documents are worth mentioning (53 Cal.3d at 1341–1342, 283 Cal.Rptr. at 903, 813 P.2d at 250 (citations omitted)):

"In determining whether a document falls within the ... [deliberative process/executive privilege exemption], the federal courts have also recognized 'that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other.' The courts have readily acknowledged, however, that the fact/opinion dichotomy may be misleading, and have refused to apply it in a mechanical or unthinking manner. The privilege, as one appeals court has written, 'is intended to protect the deliberative *process* of government and not just deliberative *material.*' Accordingly, in some circumstances 'the disclosure of even purely factual material may so expose the deliberative process ... that it must be deemed exempted....' Decisions holding the exemption to be applicable even to 'purely factual material' are legion.

"In short, the courts' focus ... is less on the nature of the records sought and more on the effect of the records' release. The key question in every case is 'whether the disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.' Even if the content of a document is purely factual, it is nonetheless exempt from public scrutiny if it is 'actually ... related to the process by which policies are formulated' or 'inextricably intertwined' with 'policy-making processes.' "

Although in the present case we need not go as far as the California Court in *Times–Mirror* did in applying the above analysis to its facts and legal context (because we are remanding this matter for further consideration), an example of how that court applied the analysis may be illustrative for the Circuit Court's consideration on remand (53 Cal.3d at 1343, 283 Cal.Rptr. at 904, 813 P.2d at 251):

"Disclosing the identity of persons with whom the Governor has met and consulted [may be] the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information [may] indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment."

█ In light of the above-summarized principles, it is clear that the trial court correctly rejected the defendants' blanket claim of executive privilege encompassing all of the telephone and scheduling records here involved. Bills from telephone service providers and listings of scheduled appointments are not communications "of an advisory or deliberative nature," *Hamilton*, 287 Md. at 563, 414 A.2d at 925. Accordingly, under *Hamilton*, "a presumptive privilege" does not attach to them upon the claim of executive privilege, and the burden was upon the defendants to establish that the records were privileged. *Ibid.*

█ Considering the defendants' assertion of an executive privilege exemption on an item-by-item basis requires application of the balancing test discussed in *Hamilton*, 287 Md. at 564–567, 414 A.2d at 925–927. Although the weight in the *Hamilton* balancing test given the request of the person seeking the governmental record was grounded in the discovery rights of a party in pre-existing litigation,[17] the initial weight accorded the plaintiff's request in the balancing test in the present case has been pre-determined legislatively by the Maryland Public Information Act's general, but explicit, disposition favoring disclosure. Because the records at issue here reflect *only factual material*, and there yet has been no contention made that they "include facts obtained upon prom-

---

17. *Hamilton* reached us upon certified questions of law from the United States District Court for the District of Maryland arising from a civil suit in the District Court brought by the personal representative of the estate of a murder victim against the superintendent of the Spring Grove State Hospital and two of its staff psychiatrists for the alleged negligent release of the killer. 287 Md. at 546–547, 414 A.2d at 916–917. Thus, the plaintiff's need for the governmental record in that case was balanced against the assertion of executive privilege.

ises or understandings of confidentiality, [or] investigative facts underlying and intertwined with opinions and advice," *Hamilton,* 287 Md. at 565, 414 A.2d at 926,[18] an *in camera* review and balancing test application are appropriate. *See* § 10–623(c)(2). As noted earlier, the defendants' assertion of a blanket executive privilege, with its attendant presumption in favor of non-disclosure, fails because the records sought to be protected patently do not represent the content of confidential communications of an advisory or deliberative nature. *Hamilton,* 287 Md. at 563, 414 A.2d at 925. Rather, the defendants' claimed exemptions seek to protect records from which such content may be inferred or discovered. Such a basis for the claimed exemption falls at best at the fringes or perimeter of potentially protectable records for which an *in camera* review and balancing test are necessary to assure proper vindication of the competing interests.

The defendants assert that the telephone and scheduling records constitute "facts the disclosure of which would impinge on the deliberative process." *Hamilton,* 287 Md. at 565, 414 A.2d at 926. They make various arguments in support of this assertion.

First, the defendants seem to argue that disclosure of the names of persons with whom the Governor met or who were telephoned by the Governor, Mr. Riddick, or Ms. Smith–Bauk, would violate the privacy rights of those officials and the persons with whom they spoke, and would make persons reluctant in the future to give the Governor advice since their names might be revealed. (Petitioners' brief at 20–22, 28).

---

**18.** The defendants, while not asserting that any of the particular records at issue in this case involved promises of confidentiality, do contend as a general matter that the Governor and his staff "must have the freedom to contact individuals with the assurance of confidentiality." (Petitioners' brief at 25). If, upon remand, the defendants make a showing, by affidavit or otherwise, that the recipient of a particular telephone call, or a person who met with the Governor, was given assurance that the fact of the telephone call or the fact of the meeting would be kept confidential, then under the *Hamilton* opinion such number or the person's name in the scheduling record should be redacted.

We observe that the executive privilege doctrine, as recognized in *Hamilton* and the cases there cited, is not for the benefit of the public officials or those giving advice to the public officials, but "is for the benefit of the public," *Hamilton*, 287 Md. at 563, 414 A.2d at 924. That is not necessarily dispositive of defendants' claim here.

 Furthermore, although the substance of what an adviser tells a public official may be entitled to some protection under the executive privilege doctrine, nothing in *Hamilton*, or the cases there relied upon, suggests that executive privilege permits nondisclosure of every adviser's name. The *Hamilton* case involved a confidential report from the Governor's Chief Legislative Officer and Legal Counsel which contained opinions and recommendations for the Governor's use, and we held that the report, or parts of the report, fell within the doctrine of executive privilege and might not have to be disclosed. Giving free range to the defendants' argument in the case at bar, a Governor could keep secret the name of his Chief Legislative Officer and Legal Counsel, or the names of some other staff members who advise him. We do not believe that the privilege for confidential communications of an advisory or deliberative nature extends so far as to keep secret the names of all advisers.

 The defendants have yet to present evidence supporting their assertion that the mere public disclosure of the Governor's Office telephone bills or of the Governor's prior appointments will have a chilling effect upon the willingness of persons to render advice to the Governor. And, as stated above, we recognize no general executive privilege for public officials' office telephone bills or scheduling records. Nevertheless, this case is being remanded to the Circuit Court for further proceedings. Our opinion does not preclude the defendants from attempting to show the trial court, on remand, that because of identified special circumstances, disclosure of a specific telephone number, or certain specific numbers, or disclosure of specific scheduling records, will interfere with the deliberative process in the Governor's Office. If the trial

court concludes that the defendants have made a sufficient showing as to any specific telephone call or any specific appointment, it should redact the records accordingly.

The defendants argue that some of the telephone calls and meetings with the Governor relate to economic development projects and efforts "to attract businesses to locate headquarters or operations in Maryland. * * * With access on demand to the Governor's telephone records, reporters easily could identify a series of telephone calls to a particular company, inferring negotiation activity. * * * [T]he simple contact by a reporter to such a company could scare away that potential source of economic development." (Petitioners' brief at 23–24). The defendants make a similar argument with regard to recruiting persons for high level state employment such as a presidency of a state university. At the time the Post brought this suit in December 1997, it was seeking telephone bills and scheduling records for a six-month period from February 1, 1996, through July 31, 1996. In other words, the Post was seeking records of telephone calls and appointments for one and a half to two years in the past. The records sought are now four years old. Present disclosure of four-year-old telephone or scheduling records may or may not upset current economic development negotiations or recruitment negotiations which might fail if they are not kept confidential. Current disclosure of telephone numbers or meetings relative to such negotiations that have expired or been consummated may or may not have a sufficiently inhibitory effect on the Governor's ability to maintain similar negotiations in the future. Our decision in this case is without prejudice to the defendants' making a showing to the Circuit Court on remand that a particular four-year-old telephone number or scheduling record either is still involved in current confidential economic development or recruitment negotiations and that present disclosure of that number or record will interfere with the negotiations, or that such disclosure is likely to interfere substantially with the Governor's ability to have such negotiations in the future.

To reiterate, we reject the defendants' argument that the factual records here involved are generally subject to executive privilege and, therefore, are nondisclosable under § 10–615(1) of the Act. Nonetheless, if the defendants upon remand are able to demonstrate that certain specific records or portions thereof are privileged under the principles set forth in *Hamilton*, 287 Md. at 564–565, 414 A.2d at 925–926, and in this opinion, the Circuit Court should permit redactions of that material.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PETITIONERS TO PAY TWO THIRDS OF THE COSTS AND RESPONDENT TO PAY ONE THIRD OF THE COSTS.*

BELL, C.J., RAKER and CATHELL, JJ., dissent.

CATHELL, Judge, dissenting.

I respectfully dissent. I believe that the doctrine of separation of powers, which, unlike its federal counterpart, is incorporated expressly in the Constitution of Maryland through the Declaration of Rights, does not permit the Legislature to create laws that can be used directly to require the Governor to make his nonpublic activities public, while acting as Governor, including his duties of appointment, scheduling of private interviews and many of the other duties inherent to the position of Chief Officer of the heretofore separate and independent executive branch.

Today, the majority imposes a heavier burden on the Governor than the federal courts, including the Supreme Court of the United States, have imposed upon the President, even though the federal courts view the doctrine of separation of powers as an implied doctrine. The doctrine is nowhere stated in the Constitution of the United States, the Bill of Rights, or the constitutional amendments enacted thereafter.

Conversely, Article 8 of the Maryland Declaration of Rights provides:

### Article 8. Separation of powers.

That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

Maryland's recognition of the separation of powers is found not just in the express provisions of Article 8 of the Declaration of Rights. The Maryland Constitution, Article II, Section 17, adopted in the Constitution of 1867, provides: "To guard against hasty or partial legislation and encroachment of the Legislative Department upon the co-ordinate Executive and Judicial Departments, every Bill . . . [shall] be presented to the Governor." The initial clause of this provision notes that the reason for empowering the Governor with the veto power is to protect the separation of powers in Maryland. The comparable bill signing and veto provision in the United States Constitution, on the other hand, makes no mention of the importance of guarding against "encroachment of the Legislative Department upon the co-ordinate Executive and Judicial Departments." It merely states that bills will be presented to the President for signing and provides the procedure to be followed should he or she refuse to sign a bill. *See* U.S. Const. art. I, § 7, cl. 2–3.

It is my view that, especially in light of Maryland's express constitutional provisions, the majority is not sufficiently deferential to the mandates of the separation of powers doctrine. What the majority inflicts upon the doctrine and the Governor with its decision in this case may well come home to roost. No distinction between the executive and judicial branches is made in the applicability of Article 8.[1] Unlike the federal system, where separation of powers is implied, there is more

---

1. I discuss, *infra,* the conspicuous absence of any exemption in the State Public Information Act for the judiciary, while this branch is expressly exempted from the Open Meetings Act.

room for interpretation recognizing the confidentiality needs of the judicial branch. There is little room to maneuver in Maryland when the doctrine, by express constitutional provision, includes all branches. The federal courts, unlike the majority today, recognize that the separation of powers, implied in the federal Constitution, protects the private office where the Chief Executive conducts public business from direct requests for records under the federal Freedom of Information Act.

It is important to address the beginnings of the separation of powers doctrine in Maryland as an express constitutional provision. The first phrase, "[t]hat the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other," was in the original 1776 Declaration of Rights as Article 8.[2] It, along with the Constitution of Maryland, was passed on August 14, 1776. Significantly, the separation of powers doctrine was not included in the Declaration of Rights as an afterthought. It was an important aspect of the original constitution, and subject to some opposition. The Maryland Gazette of October 24, 1776, contained a poem, entitled *"The Song of the Man in the Moon,"* apparently expressing displeasure with the inclusion of the provision:

I saw in labour to bring forth

A government of fame and worth:

But when 'twas born, the granny said,

The monster had a triple head.

. . . .

Surely agreeable to nature,

One head's enough for any creature;

---

2. The provision was moved to Article 6 in the Constitution of 1851, which also added the second phrase "and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." This language, in its entirety, was moved back to Article 8 in the Constitution of 1864 and remained there after the Constitution of 1867, which introduced the Governor's veto power. An attempt to remove the separation of powers provision failed in 1968, when the proposed 1968 Constitution was rejected.

But if that head should be divided,

How will the quarrel, be decided.

John C. Rainbolt, *A Note on the Maryland Declaration of Rights and Constitution of 1776*, 66 Md. Hist. Mag. 420, 429–30 (1971) (describing the constitutional controversy as between those who wanted a more democratic form of government and those wanting a more elitist form).

The importance of the inclusion of the express provision in the Declaration of Rights in 1776 has been described by commentators over the years:

> *Separation of powers.* One of the Proprietary grievances was that the Governor and his Council exercised legislative, executive, and judicial powers, as in effect did the Proprietor, and as did Parliament. This was recognized as a potential source of oppression, and violated the political theories that Montesquieu and others had brought into vogue.[3] Most of the bills of rights, including George Mason's famous Virginia model, contained provisions requiring a separation.... [4]

H.H. Walker Lewis, *The Maryland Constitution 1776*, 47 (1976).

A resolution was adopted by the Constitutional Convention of 1850 that again stressed the importance of the separation of powers principle in Maryland. It provided:

---

3. "Historians credit BARON DE MONTESQUE, SPIRIT OF THE LAWS (1748), for the concept of separation of powers, based on Montesque's incorrect understanding of the English system." Friedman, *supra*, at 689 n. 206.

4. Most states, unlike the federal government, have explicitly expressed their preferences for the separation of powers in their constitutions. They include: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia and Wyoming. *See* Friedman, *supra*, at 688–89 n. 197.

5th. An acknowledgement of the impropriety of the concentration of even the necessary powers of government in a few hands, and of the indispensableness of guarding against usurpation by so constituting the different departments and functionaries, that these shall serve as checks and balances to each other.

*Proceedings of the Maryland State Convention to Frame a New Constitution* 110 (1850). This resolution apparently was approved and embodied in the Article 6 restatement of the separation of powers doctrine in the 1851 Constitution, now found in Article 8. Alfred S. Niles, *Maryland Constitutional Law* 10–11 (1915), indicates the importance our Framers, and this Court, placed on these early constitutional provisions:

The first constitution of Maryland was framed in the same year as [the] Declaration of Independence was adopted. . . .

This constitution, as amended from time to time, remained the fundamental law of our State until 1851, when a second constitution was adopted, which was succeeded by the Constitution of 1864, and that by the Constitution of 1867, which [in 1915 and now] is still in force.

. . . .

"Constitutions are not to be interpreted according to the words used in particular clauses. The whole must be considered, with a view to ascertain the sense in which the words were employed, and its terms must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. . . . It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people. . . ." [Citing *Manly v. State,* 7 Md. 135, 147 (1854).]

. . . *State v. Mayhew,* 2 Gill [487,] 497 [ (1845) ]:

A contemporaneous construction of the Constitution of long duration, continually practiced under, and through which innumerable rights of property have been acquired,

ought not to be shaken but upon the ground of manifest error and cogent necessity.

Discussing the different treatments of the separation of powers doctrine by the federal government and Maryland, Niles, *supra*, states at 19:

> The limitation upon the Federal Government is, however, not found in the words of the Constitution itself, but is simply an unavoidable consequence from all its provisions taken together.
>
> The language of our Maryland Declaration of Rights, . . . is clear and explicit; and our courts have been alert to oppose even the first steps toward usurpation by one department of the powers or duties of either of the others, in one case declaring *ex mero motu* [on its own motion to prevent injustice], a law unconstitutional and void on this ground, although the point was not made by counsel. [citing *Beasley v. Ridout,* 94 Md. 641, 52 A. 61 (1902); *Crane v. Meginnis,* 1 G. & J. 463 (1829) ].

Continuing to discuss the importance of the separation of powers doctrine in our early history, Niles, *supra*, at 22, quotes from *The Chancellor's Case*, 1 Bland 595, 672 (Md.Ch. 1825):

> This division and separation is the peculiar characteristic and great excellence of our Government. It is the grand bulwark of all our rights, and every citizen has the deepest interest in its most sacred preservation. Each of these several departments should be kept, and should feel it to be its highest honor, to keep strictly within the constitutional boundaries assigned to it. The Legislature should not encroach upon the judiciary, nor upon the Executive; nor should either of those departments trench upon each other, or upon the legislative.

Niles later discusses the adoption of the constitutional provision giving the Governor the veto power:

> In the Constitution of 1867 under Article [II], Section 17 the Governor's function in approving—or not—legislation was in significant part to guard against . . . encroachment of

the Legislative Department upon the co-ordinate Executive and Judicial Department, . . .

*Id.* Niles specifically references this language as a distinct reason for the veto power in Maryland and contrasts it with the language of the federal constitutional provisions granting the veto power: "In the Federal Constitution, no reason is given for the existence of this power. In the Maryland Constitution, it is stated to be 'to guard against . . . encroachments of the Legislative Department upon the [other] Departments.'" *Id.* at 119. At the time that the veto language was being added by the 1867 Constitution, the 1867 Constitutional Convention, commenting on the Declaration of Rights and the new veto power, stated:

Sec. 17. The most important change of all concerning the Executive office, is investing it with the Veto Power.

The words in which this power is given are nearly the same as in the Constitution of the United States. There is, however, a preamble prefixed defining its use to be "to guard against . . . encroachments of the Legislative Department upon the co-ordinate Executive and Judicial Departments,". . . .

Edward Otis Hinkley, *The Constitution of the State of Maryland,* app. at 126 (1868).

It is important to note that there has been an attempt to repeal Maryland's express constitutional provision with respect to the separation of powers. There is no way to know, however, why the citizens of Maryland rejected the proposed Constitution of 1968, which, among other things, attempted to abolish Article 8 of the Declaration of Rights, last readopted in the Constitution of 1867. "The proposed 1967–68 Constitution did not contain an explicit separation of powers provision relying, as does the United States Constitution, on the structure of the government to create the inference of separation. The proposed constitution was rejected by voters." Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights,* 71 Temp. L.Rev. 637, 688 n.194 (1998) (citation omitted).

As I perceive the history surrounding the adoption of the original separation of powers provision in the Declaration of Rights and the Constitution of 1776, it was based on the colonists' experiences in attempting to deal with, and suffering from, the rule of the Governor and his Council, an entity that exercised the power and control of the legislative, executive, and judicial branches. To an extent, the colonists had suffered the same abuses from afar by the English Parliament. Moreover, prior to the adoption of the 1776 Declaration of Rights, the colonists had been subjected to a legislative body that acted like Parliament. The powers of the colonial legislature were described in an early Maryland case that construed a pre-Declaration of Rights colonial statute from 1773. In *Partridge v. Dorsey's Lessee*, 3 H. & J. 302, 322 (1810), the Court said:

> At the time the Act of Assembly passed, the power and jurisdiction of the General Assembly of Maryland ... were as great and transcendent, as the power and jurisdiction of the Parliament of England, within the scope of their authority. And Sir Edward Coke informs us, "the power and jurisdiction of Parliament is so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds." ... He [Sir William Blackstone] also declares, that "all mischiefs and grievances, operations and remedies, that transcend the ordinary course of the laws, are within the reach of this extraordinary tribunal."

The citizens of the new Maryland had experienced numerous years of that type of governance, whereas the fledgling federal government had not, as a separate entity, been subject to the same problems because the federalist system did not then exist. The colonies formed the federal government in order, in part, to better withstand and fight the past abuses of Parliament and the colonial governors. At the time of the creation of the federal government, and later its constitutional framework, the federal system had no direct experience with the abuses of power when all functions of government repose in one entity. The states, particularly Maryland, as I interpret the events of 1776, considered the separation of powers to

be more important than the federal government ever did. The experience of the colonies had been first-hand. Because it was more important to them, Marylanders were not willing to rest upon an assumption that the doctrine would be implied from the form of the government they were adopting. They wanted it written in constitutional stone, not suggested by constitutional implication.

With all due respect to the majority, the doctrine's history in this state calls for a *more* rigid adherence than that afforded to the federal implication of separation of powers, not the lesser standard the majority adopts with its position in this case. As the older cases note, the doctrine of separation of powers always has been a sacred trust in Maryland. Rather than affording it the status to which this Court previously has said it is entitled, the majority today relegates the doctrine to an unimportant requirement that the Legislature can ignore when it chooses. Although it opens the Governor's office to a highly-reputable newspaper in this case, the door remains open to any scandal rag searching for controversy in the future.

The majority distances itself from most of this Court's basic, albeit early, cases on the subject of separation of powers. In *State v. Chase*, 5 H. & J. 297 (1821), we were faced with a challenge to the Legislature's imposition of additional *judicial* duties on judges. We upheld the power of that entity to impose judicial duties on the judicial branch but, in dicta, rejected any power to impose nonjudicial duties. We said:

We hold it to be perfectly clear, that the Legislature may rightfully and constitutionally, impose upon the Judges any new and additional judicial duties....

Such a right is inseparable from the genius of our institutions, and from the nature of things it must be so; if it were otherwise, Courts of justice would answer but half the purposes of their institution; and all Judges are supposed to accept their appointments, with a knowledge, and tacit consent, that their labors may from time to time be increased or diminished, according to public exigency—seldom

diminished to be sure, though sometimes increased with no very sparing hand.

New judicial duties may often be unnecessarily imposed, *and services, not of a judicial nature, may sometimes be required. In the latter case, a Judge is under no legal obligation to perform them.*

*Id.* at 304 (emphasis added). In *Crane,* 1 G. & J. at 472–73, the Court of Appeals opined:

The Constitution of this State ... is the immediate work of the people, in their sovereign capacity, and contains standing evidences of their *permanent will.* It portions out supreme power, and assigns it to different departments, prescribing to each the authority it may exercise, and specifying that from the exercise of which it must abstain. The public functionaries move then in a subordinate character, and must conform to the fundamental laws or prescripts of the creating power. When they transcend defined limits, their acts are unauthorized, and being without warrant, are necessarily to be viewed as nullities. If considered as valid acts, the distinction between unlimited and circumscribed authority is done away, the derivative exerts original power, and of constitutional law nothing is left but the name.

The legislative department is nearest to the source of power, and is manifestly the predominant branch of government. Its authority is extensive and complex, and being less susceptible on that account of limitation, is more liable to be exceeded in practice.... The check to legislative encroachment is to be found in the declaration, that the legislative, executive, and judicial powers ought to be kept separate and distinct; and in the solemn obligations of fidelity to the Constitution, under which all legislative functions are performed. [Emphasis added.]

*See also Mayhew,* 2 Gill at 497; *Prout v. Berry,* 2 Gill 147, 149 (1844) ("[T]he Legislature possessed no power in any given determination of the Court of Appeals, to declare what would be the rights of the parties; for however consistent with justice and equity such a declaration may have been, the

Legislature could exercise no judicial power."); *Mitchell v. Mitchell,* 1 Gill 66, 84 (1843) ("[I]t is the province of Courts of justice to expound laws, and not to legislate; that is a duty which belongs to a different department of the government.").

In *Miller v. State ex rel. Fiery,* 8 Gill 145 (1849), the Legislature passed an Act in 1845 requiring the Washington County Court to grant an appeal in that case. In holding that the Legislature violated the constitution by attempting to exercise judicial power, we said:

> [W]e think it manifest that the Act of 1845, ch. 358, is the exercise of such an unconstitutional power, by the General Assembly of Maryland, as renders it wholly inoperative and void. . . . [T]he legislative and judicial powers, under the Constitution of this State, are confided to different branches of the government; the Legislature are incompetent to exercise judicial powers.

*Id.* at 148. We again stressed the importance of separation of powers in *Regents of the University of Maryland v. Williams,* 9 G. & J. 365, 410 (1838):

> The province of the legislative department of government is to make laws, confining itself within the limits prescribed by the Constitution. It cannot usurp the powers confided to either of the other departments. . . . For if the Legislature could, without control, exercise judicial as well as legislative powers, the tenure of everything dear and valuable to the citizen, would be, the unrestricted will of that body; to guard against which, the provision was introduced for a division of the powers of the government.

In *Berrett v. Oliver,* 7 G. & J. 191 (1835), the Legislature passed a bill negating a decree in a private action. The Court said: "Can the Legislature exercise such a power? Unquestionably not. This Act of Assembly is [a] direct and obvious violation of our Declaration of Rights [Article 8]. . . ." *Id.* at 206. In *Wright v. Wright's Lessee,* 2 Md. 429 (1852), we rejected an attempt by a divorcee to assert a legislative power

to adjust the property rights of the parties, in part on separation of powers grounds.[5] There we said:

> Under [Article 24 of the Declaration of Rights] a person may be ... disseized of his freehold, & c., *provided it be done by the judgment of his peers, or by the law of the land.*

> The words by "the judgment of his peers," mean a trial by jury, and the words "by the law of the land," which are copied from *Magna Charta*, are understood to mean due process of law, according to the course and usage of the common law.... And by the sixth section of the same instrument it is said, "the legislative, executive and judicial powers of government, ought to be forever separate and distinct from each other." The evident purpose of the declaration last quoted, is to parcel out and separate the powers of government, and to confide particular classes of them to particular branches of the supreme authority.... Within the particular limits assigned to each, they are supreme and uncontrollable.... It [the Legislature] has not undertaken to deal with questions of property; if it had attempted to have done so, such attempt would have been an assumption of power unauthorized by the constitution.

*Id.* at 452–53 (citations omitted).

One purpose of the Constitution of 1851 was to abolish lifetime appointments that had proliferated under the Constitution of 1776. An Adjutant General had been appointed to lifetime tenure in *Watkins v. Watkins,* 2 Md. 341 (1852). While he was in office, the Constitution of 1851 was passed, which limited the term of the Adjutant General to six years. It also required the Governor to appoint officers "with the advice and consent of the senate." *Id.* at 354. The Governor appointed a new Adjutant General while the Legislature was not in session and thus the Governor had not received the

---

5. *Wright* held so despite recognizing the power of the Legislature to annul marriages and grant divorces. Though it seems unusual now, the Legislature apparently inherited the power to grant divorces from Parliament's assumption of the power to annul marriages. Such practice has long since been abolished. *See* Md. Const. art. 3, § 33.

"advice and consent" of the Senate. When the new Adjutant General attempted to take office, the old Adjutant General (both were named Watkins) refused to turn over the office, claiming life tenure because he had been appointed when the constitution so provided. The newly-appointed Adjutant General sought a Writ of Mandamus directing the former Adjutant General to surrender the office. The trial court declined and we affirmed, noting

> that in all human contrivances confidence must be reposed somewhere, and that under the distribution of the powers of the government in our State, it is not given to the judiciary to *compel* action on the part of a co-ordinate branch of government. Its authority is confined to *restraining* the potency of its enactments when they transcend constitutional limits.

*Id.* at 356. *See Prince George's County Comm'rs v. Mitchell,* 97 Md. 330, 340, 55 A. 673, 675 (1903) (voiding as unconstitutional, pursuant to Article 8, a statute that placed control of a local courthouse, in which the entire county government was housed, in the hands of a court-appointed judicial officer); *Board of Supervisors v. Todd,* 97 Md. 247, 263–65, 54 A. 963, 966 (1903) (voiding a statute under the separation of powers doctrine that mandated the circuit court to order elections upon petition); *Robey v. Prince George's County Comm'rs,* 92 Md. 150, 160–62, 48 A. 48, 50–51 (1900) (striking down a statute that required judges to supervise executive accounts as violative of separation of powers); *Roche v. Waters,* 72 Md. 264, 272, 19 A. 535, 538 (1890) ("The Act of 1868, by its terms ... authorizes the court to change the effect of decrees which had become final. It is an exercise of judicial power by the Legislature."); *Dorsey's Lessee v. Gary,* 37 Md. 64, 79 (1872) (declaring unconstitutional an act, which reinstituted certain lawsuits, for infringing on judicial powers); *Mayor of Baltimore v. Horn,* 26 Md. 194, 207 (1867) (overturning, as a legislative infringement upon the judicial power, a law authorizing suit against specific property owners); *Thomas v. Owens,* 4 Md. 189, 227 (1853) (stating as to the separation of powers provision in the Declaration of Rights: "Were it not

for such a provision, the whole government would exist only by the permission of the legislature.").

The case of *County Commissioners of Queen Anne's County v. County Commissioners of Talbot County*, 108 Md. 188, 69 A. 801 (1908), emphasized the great importance this state has often afforded to the sanctity of the separation of powers as a governmental foundation. The case involved a long-standing dispute over which county should pay to erect and repair a bridge over the Kent Narrows, which would replace a solid causeway erected in those waters by Queen Anne's County, but which allegedly had interfered with the ability of residents of Talbot County to navigate the Narrows. After other attempts to resolve the dispute legislatively, the General Assembly enacted legislation requiring that both counties be financially responsible for the construction of the ultimate replacement bridge. After Talbot County refused to pay its share of the cost, the Legislature enacted another statute that required Talbot County to assess its citizens' property to produce a specified amount of money, which would then be used to reimburse Queen Anne's County for one-half of its expenditures. We held that the statute violated the separation of powers provision of our Declaration of Rights. We asked ourselves "whether the Legislature has ... attempted to exercise functions that belong to the judicial department of government, or in other words, has it attempted to pronounce a judgment or decree?" *Id.* at 196, 69 A. at 804. We answered:

> [The setting of the amount due] is done without any judicial inquiry as to how much the bridge actually cost ... or as to what the actual cost of maintaining the bridge may be. In some jurisdictions it is possible that such an ascertainment by the Legislative branch of the government would stand, but certainly it cannot in Maryland.
>
> Article 8 of the Declaration of Rights declares "that the Legislative, Executive and Judicial powers of government ought to be forever separate and distinct from each other."
>
> An Act of the Legislature determining what amount of indebtedness is due ... by one county to another, is an

attempt to exercise judicial functions and therefore unconstitutional and void.

*Id.* at 196–97, 69 A. at 804 (citation omitted).

In *Close v. Southern Maryland Agricultural Ass'n,* 134 Md. 629, 644, 108 A. 209, 215 (1919), after reciting a number of cases that attempted to confer licensing authority upon the courts, we rejected the authority of the Legislature to confer upon us the power to grant gambling exemption licenses to agricultural associations, stating simply that "[i]t is for the Legislature, and not for the courts to pass statutes." We held that the law was "invalid." *Id.*

Even in our more modern cases we have exhibited more deference to the separation of powers doctrine than does the majority today. We said in *Perkins v. Eskridge,* 278 Md. 619, 626, 366 A.2d 21, 27 (1976), *overruled on other grounds by Parrott v. State,* 301 Md. 411, 483 A.2d 68 (1984), that

neither the judiciary nor the legislature is superior, one over the other—rather they are coordinate branches of government and the former must exercise its duty and authority to determine what the law is in order to ensure the viability of the separation of powers provision of the Maryland Constitution (Article 8 of the Declaration of Rights).

We discussed the doctrine at some length in *Department of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 334 A.2d 514 (1975), in which the Legislature had created a statutory scheme of a *de novo* appeal with a right to a jury trial that, in essence, empowered juries to issue administrative permits as part of the judicial process. We stated:

[T]he Department of Natural Resources appealed to this Court, asserting that this type of extensive and nullifying judicial de novo review, under § 9–308(b), is not permitted by the Maryland Constitution because "the judicial branch of government may not usurp the province of the administrative prerogative." We agree....

. . . .

That aspect of the Constitution which is spotlighted by this case is the fundamental doctrine of separation of pow-

ers, a principle expressly or impliedly recognized in the basic law of every state in this nation. This doctrine has long been a cornerstone of this State's concept of government and finds forthright expression in Article 8 of the Declaration of Rights contained in the Constitution of Maryland in these words:

"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

*Although Maryland's statement of the separation of powers is "a more concrete barrier than any which the Supreme Court has had to hurdle under the Federal Constitution,"* R. Oppenheimer, *Administrative Law in Maryland,* 2 Md. L.Rev. 185, 188 (1938), the right of the Legislature to delegate powers to administrative agencies has been recognized in this State for more than 125 years. *Harrison v. Mayor & City Council of Baltimore,* 1 Gill 264 (1843). *Id.* at 217–18, 334 A.2d at 519–20 (emphasis added). We then noted that in response to the many practical needs of government, the number of administrative agencies has flourished. Additionally, within the agencies there has occurred "some mingling, blending and overlapping of the legislative, executive and judicial functions." *Id.* at 220, 334 A.2d at 521. This "elasticity" of the separation of powers doctrine, we noted, was sensible and permissible. We went on to state, however:

[T]his constitutional "elasticity" cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power, as the Maryland Constitution does not permit a merger of the three branches of our State government, nor does it "make any one of the three departments subordinate to the other, when exercising the trust committed to it." *Painter v. Mattfeldt,* 119 Md. 466, 472, 87 A. 413[, 416] (1913). When the Legislature confers, by enactment, powers upon one of the other branches of government which are beyond those permitted under the Constitution, *or any of the three branches of government takes unto itself*

*powers denied to it or those strictly within the sovereignty of another branch,* the courts of this State must step in and declare such encroachments to be constitutionally prohibited....

. . . .

... "The basic proposition that a constitutional court should not be required to perform nonjudicial functions is probably beyond challenge." 4 Davis, *Administrative Law Treatise,* § 29.10 (1958). Because courts cannot be required to exercise nonjudicial duties it has been held by this Court that it is beyond the power of the Legislature to require the judiciary to: approve accounts of county officers before payment, *Robey v. Prince George's County Comm'rs,* 92 Md. 150, 48 A. 48 (1900); perform duties tantamount to a board of review in assessing property for tax purposes, *Baltimore City v. Bonaparte,* 93 Md. 156, 48 A. 735 (1901); appoint a board of visitors to supervise the county jail, *Beasley v. Ridout,* 94 Md. 641, 52 A. 61 (1902); provide for referendum concerning issuance of liquor licenses, *Board of Supervisors v. Todd,* 97 Md. 247, 54 A. 963 (1903); issue licenses permitting pari-mutuel betting on horse races, *Close v. Southern Md. Agr. Asso.,* 134 Md. 629, 108 A. 209 (1919); and issue liquor licenses, *Cromwell v. Jackson,* 188 Md. 8, 52 A.2d 79 (1947). Thus, in regard to administrative agencies, which, while often functioning as fact-finding bodies, perform essentially nonjudicial duties, a Maryland court's "inquiry is [almost always] limited to finding whether there was illegality or unreasonableness in the ... action—when that inquiry is finished, judicial scrutiny ends...." *Balto. Gas [and Elec.] Co. v. McQuaid,* 220 Md. 373, 382, 152 A.2d 825[, 830] (1959).

*Id.* at 220, 226, 334 A.2d at 521, 524 (third alteration in original) (emphasis added). *See also Maryland State Police v. Warwick Supply & Equip. Co.,* 330 Md. 474, 480, 624 A.2d 1238, 1241 (1993) ("The delegation doctrine prohibits a legislative body from delegating its law-making function to any other branch of government or entity and is a corollary of the separation of powers doctrine implicit in the United States

Constitution and expressly provided in the Maryland Constitution."); *Commission on Med. Discipline v. Stillman,* 291 Md. 390, 401, 435 A.2d 747, 753 (1981) ("The separation of powers doctrine mandates that the legislature may not divest the judiciary of [its] inherent powers."). *But see McCulloch v. Glendening,* 347 Md. 272, 282–84, 701 A.2d 99, 104 (1997) (noting that Article 8 does not mandate an absolute separation of powers among the ·branches of government); *Judy v. Schaefer,* 331 Md. 239, 261, 627 A.2d 1039, 1050 (1993) (stating that "Art[icle] 8 does not impose a complete separation between the branches of government," and delegation of legislative power to the executive branch is constitutionally permissible "where sufficient safeguards are legislatively provided for the guidance ... in ... administration of the statute.'" (quoting *Department of Transp. v. Armacost,* 311 Md. 64, 81, 72, 532 A.2d 1056, 1064, 1060 (1987))).[6]

In my view, our long-standing precedent regarding the separation of powers dictates that the statute at hand is inapplicable for the purpose sought in this case. Our two recent decisions, *McCulloch,* 347 Md. 272, 701 A.2d 99, and *Judy,* 331 Md. 239, 627 A.2d 1039, are distinguishable because

---

6. A body of Maryland law has developed which distinguishes and permits the delegation of legislative and quasi-judicial functions to administrative agencies. *See, e.g., Armacost,* 311 Md. at 77–82, 532 A.2d at 1062–65; *Stillman,* 291 Md. at 413–14, 435 A.2d at 756. In *County Council v. Investors Funding Corp.,* 270 Md. 403, 436, 312 A.2d 225, 243 (1973), we said:

The constitutional doctrine of separation of powers ... does not itself inhibit the delegation to an administrative agency of a blend of executive or legislative powers with powers judicial in nature; the determining factor is not so much the specific powers granted to the administrative agency, but rather the relationship of the courts to the exercise of that power.

The present case involves not the delegation by the Legislature of duties and regulatory functions to regulatory entities created by it. Thus, this case is not factually or legally a regulatory doctrine case. The majority's view that the statute applies to the Office of the Governor, which results in the imposition of restrictions by the legislative branch on the executive, compromises the ability of the Governor to formulate policy, seek advice, arrive at solutions to basic governmental problems, secure preliminary work papers, and to preserve his independence otherwise.

the exercises of the challenged powers in those cases were supported by other constitutional provisions, namely, those relating to the Governor's supervision over Executive Branch employees in *McCulloch* and those relating to the Governor's involvement in the budget process in *Judy*. With the exception of these two cases, the similar cases to which they refer, and the two aberrational cases arising out of the strife of Maryland's peculiar position during the Civil War, *McCormick v. Deaver*, 22 Md. 187 (1864) and *Mayor of Baltimore v. Howard*, 15 Md. 376 (1860), this Court has long been a paramount guardian of the separation of powers doctrine. The majority opinion, in my view, disregards this long history of reverence to the principle.

Moreover, in the case *sub judice* we are not being asked to *restrain* a function of the Executive Branch; respondent seeks to have us *compel* the Governor to cooperate in the furnishing of information to it. *See Watkins*, 2 Md. at 346. This information is not sought as evidence in adversarial litigation between other parties; it is sought in a direct suit against the Governor. There is no conflict between the power of the judicial branch to require the disclosure of information necessary to resolve conflicts between citizens effectively and the reluctance of the executive to furnish the necessary information. Maryland's judicial branch, along with the federal judiciary, admittedly has that power as explained in *United States v. Nixon*, 418 U.S. 683, 711–13, 94 S.Ct. 3090, 3109–10, 41 L.Ed.2d 1039 (1974):

> It is the manifest duty of the courts to vindicate [constitutional] guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced.
>
> In this case we must weigh the importance of the general privilege of confidentiality of Presidential communications in performance of the president's responsibilities against the inroads of such a privilege on the fair administration of criminal justice. The interest in preserving confidentiality is weighty indeed and entitled to great respect. . . .
>
> . . . .

> We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. [Footnote omitted.]

We are not asked here to enforce a judicial summons on the Governor in ongoing litigation, criminal or otherwise. We are asked to compel him to aid respondent on a fishing expedition that no one, other than respondent, knows for which fish the expedition is being mounted. Asserting our constitutional power to restrain action is quite different from the power respondent asks us to exercise—to compel an action which is to the detriment of the Chief Executive and his or her power to formulate policy and gather information necessary to perform his or her functions effectively.

A question also exists: How do we enforce a decision such as that rendered in this case? A restraint on executive action generally can be self-enforced. By necessity, the Governor operates through subordinates who can be restrained. But a mandatory directive ordering a Governor to act in this particular way, I suggest, is a pig that will have difficulty trying to fly. If he declines, are we going to hold him in contempt? If he does not open his doors to the Washington Post, will the House of Delegates impeach him and the Senate try him pursuant to Article II, section 7, and Article III, section 16 of the Maryland Constitution? Moreover, what constitutional principle are we furthering in this confrontation between the executive and judicial branches, a conflict created not by us, but by the legislative branch of government? What constitutional purpose is it to serve?

We need to understand that this confrontation does not involve only the legislative branch; it is also a constitutional confrontation between the judicial and executive branches, a confrontation created by the dubious applicability of this legislation to the nonpublic aspects of the inner workings of the Office of the Governor, as contrasted with the general functions of the subordinate executive branch departments. As

indicated by our cases, we have not been reluctant to protect our own powers as a judiciary under Article 8. Interestingly, the Open Meetings Act, Maryland Code (1984, 1995 Repl.Vol.), section 10–503(a)(1)(ii) of the State Government Article, contains an express exception for judicial functions, stating that the Act "does not apply to . . . a judicial function." No similar provision exists in sections 10–611 through 10–628 of the State Government Article, entitled "Access to Public Records." What intellectual exercises will we use to secure our work from premature disclosure? How will we be able to maintain the independence necessary for our work if in contemporary time the methods and facts of our deliberations are to be made public upon request? It is easy to say we will protect the deliberative nature of our work because we have the inherent power to do so. How will we, in the future, explain that what is good for the executive goose is not good for the judicial gander?

Even the federal courts, in respect to the federal government, which had no history of centralized power abuses similar to that of the colonial governments, construe the implied constitutional requirement of separation of powers with more deference than the majority in this case affords our express provisions. In *Association of American Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898 (D.C.Cir.1993), a case concerning a federal statute that limits acts of nepotism, at issue was the applicability of that statute to the functions the President delegated to his wife as a member of a federal task force. One issue was whether the statute's language, which made it applicable to *agencies* of the government, applied to the Executive Office of the President. The court noted that under other acts, including the federal Freedom of Information Act (FOIA), federal courts had held that the White House and the Executive Office of the President were not intended to be included:

> Although [the statute] defines agency as "an executive agency," we doubt that Congress intended to include the White House or the Executive Office of the President. *Cf. Franklin v. Massachusetts,* [505 U.S. 788], 112 S.Ct. 2767,

2775, 120 L.Ed.2d 636 (1992) (holding that President is not "agency" for purposes of Administrative Procedure Act); *Meyer*, 981 F.2d at 1298 (President's advisors are not "agency" under FOIA); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir.1991) (President not APA "agency").

*Id.* at 905. That court also discussed the importance of upholding the separation of powers in view of the relationship between the President and his closest advisors:

Application of FACA[, the antinepotism statute,] to the Task Force clearly would interfere with the President's capacity to solicit direct advice on *any* subject related to his duties from a group of private citizens, separate from or together with his closest governmental associates. That advice might be sought on a broad range of issues in an informal or formal fashion. Presidents have created advisory groups composed of private citizens (sometimes in conjunction with government officials) to meet periodically and advise them (hence the phrase "kitchen cabinets") on matters such as the conduct of a war. Presidents have even created formal "cabinet committees" composed in part of private citizens. This case is no different. Here the President has formed a committee of his closest advisors— cabinet secretaries, White House advisors, and his wife—to advise him on a domestic issue he considers of the utmost priority.

Applying FACA to the Task Force does not raise constitutional problems simply because the Task Force is involved in proposing legislation. Instead, difficulties arise because of the Task Force's operational proximity to the President himself—that is, because the Task Force provides advice and recommendations directly to the President. The Supreme Court has recognized that a President has a great need to receive advice confidentially:

[There is a] valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches

that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties.

*United States v. Nixon*, 418 U.S. 683, 705–06, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (footnotes omitted); *see also Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441–49, 97 S.Ct. 2777, 2789–93, 53 L.Ed.2d 867 (1977).... Article II not only gives the President the ability to consult with his advisors confidentially, but also, as a corollary, it gives him the flexibility to organize his advisors and seek advice from them as he wishes. In *Meyer v. Bush*, 981 F.2d at 1293–97, for example, we held that the President could create a Task Force composed of cabinet secretaries and other close advisors to study regulatory reform without having to comply with FOIA....

The ability to discuss matters confidentially is surely an important condition to the exercise of executive power. Without it, the President's performance of any of his duties—textually explicit or implicit in Article II's grant of executive power—would be made more difficult. In designing the Constitution, the Framers vested the executive power in one man for the very reason that he might maintain secrecy in executive operations....

This Article II right to confidential communications attaches not only to direct communications with the President, but also to discussions between his senior advisors. Certainly Department Secretaries and White House aides must be able to hold confidential meetings to discuss advice they secretly will render to the President.

*Id.* at 908–09 (second alteration in original) (footnote omitted). As is readily discernable from *Clinton*, great efforts are made to preserve the power of the Executive Office and the separa-

tion of powers at the federal level, even though the Framers chose not to include it expressly in the federal Constitution.

A challenge was made to the adequacy of the response to a disclosure request made under the FOIA in *Meyer v. Bush,* 981 F.2d 1288 (D.C.Cir.1993). The United States Court of Appeals for the District of Columbia first identified the Government's position: "The government declined to produce these documents on the grounds that neither the Vice President nor the Task Force are 'agencies' under FOIA." *Id.* at 1291. The court quoted the portion of FOIA that defined an agency as " 'any executive department, military department, Government corporation, Government controlled corporation, *or other establishment in the executive branch of the Government (including the Executive Office of the President),* or any independent regulatory agency.' " *Id.* The court then discussed several of the cases involving the separation of powers:

> In *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Supreme Court followed the legislative history and held that the Act did not cover "the President's immediate personal staff *or* units in the Executive Office whose sole function is to advise and assist the President." *Id.* at 156, 100 S.Ct. at 971.
>
> . . . .
>
> ... The President does not create an "establishment" subject to FOIA every time he convenes a group of senior staff or departmental heads to work on a problem.

*Id.* at 1292, 1296 (internal quotation omitted).

*Kissinger,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267, which involved three appeals from denied requests for information under the FOIA, is perhaps the most interesting and comprehensive of the cases involving the FOIA. William Safire, a columnist, requested that the State Department produce transcripts of Henry Kissinger's telephone conversations during a specified period. Safire's request was limited to telephone conversations in which his name was mentioned or Kissinger discussed information "leaks" with certain White

House officials. His request, though broad, was much more constrained than the blanket request by respondent in the case at bar, which requests virtually all available telephone records, diaries, appointments, and memos, without any specificity. The second request was by the Military Audit Project (MAP) for all records of conversations Kissinger made while he was Secretary of State and National Security Advisor. The third request was from the Reporters Committee for Freedom of the Press (RCFP), and others, requesting Kissinger's telephone notes made when he was National Security Advisor and Secretary of State.

The Supreme Court held that the requesting parties "were not entitled to relief." *Id.* at 147, 100 S.Ct. at 967, 63 L.Ed.2d 267. It stated, as relevant to the case before this Court:

> The plaintiff requesters contend that even though the Federal Records and Records Disposal Acts do not contemplate a private right of action, the FOIA nevertheless supplies what was missing from those Acts—congressional intent to permit private actions to recover records wrongfully removed from Government custody. We are, however, unable to read the FOIA as supplying that congressional intent.

*Id.* at 150, 100 S.Ct. at 968, 63 L.Ed.2d 267. After disposing of the MAP and RCFP claims on other grounds irrelevant to the case *sub judice*, the Supreme Court addressed Safire's claims:

> As outlined above, the Act only prohibits the withholding of "agency records." We conclude that the Safire request sought disclosure of documents which were not "agency records" within the meaning of the FOIA.
>
> . . . .
>
> The FOIA *does* render the "Executive Office of the President" an agency subject to the Act. 5 U.S.C. § 552(e). The legislative history is unambiguous, however, in explaining that the "Executive Office" does not include the Office of the President. . . . Safire's request was limited to a period of time in which Kissinger was serving as Assistant to the

President. Thus these telephone notes were not "agency records" when they were made.

*Id.* at 155–56, 100 S.Ct. at 971, 63 L.Ed.2d 267 (emphasis added).

I discern little difference in the FOIA's use of the word "agency" and the use of the words "unit or instrumentality of the State government" in section 10–611(g)(1)(i) of the State Government Article. As indicated, the FOIA defined "agency" to include "any executive department . . . or other establishment in the executive branch of the Government. . . ." The Maryland Act applies to "instrumentalities of government." While, apparently, the majority can make a distinction, I cannot. In my view, neither Act contemplated that the Office of the Chief Executive, be it the President or the Governor, would be covered by the respective disclosure laws. With respect to the FOIA, which was the forerunner to the state Act, the federal courts clearly have held as such, and have done so, at least in part, in reliance on the separation of powers implied by the federal Constitution. In Maryland, there need be no reliance on implication. The doctrine is firmly and expressly ingrained in our Declaration of Rights and our history. It is simply incongruous to me that the majority pays less respect to an express principle in the Maryland Constitution supported by our colonial history than the federal courts pay to the principle only implied by the federal Constitution.

That the federal decisions are based substantially on such principles is further supported by other cases involving the scope of related statutes. The Supreme Court, resolving the scope of the federal Administrative Procedure Act (APA) by determining whether judicial review of an action of the President is possible under the Act on the ground that the President is an agency, stated in *Franklin v. Massachusetts*, 505 U.S. 788, 796, 800–01, 112 S.Ct. 2767, 2773, 2775, 120 L.Ed.2d 636 (1992):

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a

court." At issue in this case is whether the "final" action that appellees have challenged is that of an "agency" such that the federal courts may exercise their powers of review under the APA. We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards.

. . . .

... The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. [Citation omitted.]

Finally, in *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir. 1991), that court said:

When Congress decides purposefully to enact legislation *restricting* or *regulating* presidential action, it must make its intent clear. The Supreme Court has recognized that "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in decision."

. . .

... The answer to whether the APA should apply to the President depends on an analysis of several factors, involving the President's "constitutional powers, the multifarious responsibilities of his office, and his direct political accountability as the only elected official with a national constituency." In the absence of any affirmative evidence that these issues were considered in the legislative process and that Congress passed the APA with the understanding that it would regulate presidential as well as other executive branch action, we refuse to hold that the President is an "agency" within the meaning of the APA. [Citation omitted; alteration in original.]

In my view, the Legislature did not intend to include the Office of the Governor, as opposed to the subordinate executive branch agencies, when it used the terms "unit or instrumentality of the State government," any more than Congress intended to include the Executive Office of the President when it used the term "agency" of the government in the FOIA. Like the President's position relative to the FOIA, the office of the Governor is not expressly included in the Maryland Act. "Textual silence" should not be enough to subject him to the Maryland statute.

Had the General Assembly passed a public information statute that was limited in its applicability to require the Office of the Governor, and it alone, to provide virtually unlimited disclosure of his activities to the press or the public, it clearly would be an unwarranted interference with the activities of a coordinate branch of government and, in my view, would have been violative of Article 8 of the Declaration of Rights. I see little difference in the effect of the Court's interpretation of the statute at issue. To me, the application of the statute to the Office of the Governor violates the separation of powers, a fundamental foundation of the government of this State.

We have to look no further than the history of violence that occurred in the 1960's when riots broke out in Maryland, resulting in the Governor deploying the National Guard to preserve the peace. Obviously, he had to confer with military advisors and receive advice on the deployment of troops. Of obvious necessity, in my view, was the need to keep such information, the meetings themselves and the decisions made, confidential. With the majority's decision in this case, any member of the press or the public, including those contemplating riots, could demand access to that information even in real time. We should not presume that the world is full of people with harmless intent. The protection of these types of executive decision-making activities is guaranteed, as I perceive it, by Maryland's constitutional separation of powers provision, that the majority today, in my view, regulates to relative

impotence. If the separation of powers doctrine does not apply here, then where?

I would reverse and hold that, although the statute may apply to subordinate executive branch entities, it does not apply to the Office of the Governor. Chief Judge BELL has authorized me to state that he concurs with the views expressed herein.

RAKER, Judge, dissenting.

I respectfully dissent. I would hold that all of the records at issue that have not been disclosed already are exempt from disclosure on the grounds of executive privilege, and particularly the deliberative process privilege, as enunciated by this Court in *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980), and incorporated into the Maryland Public Information Act, Maryland Code (1984, 1999 Repl.Vol.), § 10–615(1) of the State Government Article.[1]

This Court recognized the doctrine of executive privilege as part of Maryland law in *Hamilton*, 287 Md. at 562, 414 A.2d at 924.[2] The privilege has its foundations in the common law of evidence and the constitutional principle of separation of powers, including the express 'provision of Article 8 of the Maryland Declaration of Rights. *See id.* While the Court observed that executive privilege generally is not absolute, it found that the interest in protecting confidential government

---

1. Section 10–615 states, in relevant part, that "[a] custodian shall deny inspection of a public record or any part of a public record if: (1) by law, the public record is privileged or confidential."

2. The Court, in *Hamilton*, was ruling on a certified question of Maryland law from the United States District Court for the District of Maryland, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 1995 Repl.Vol.) §§ 12–601–12–609 of the Courts and Judicial Proceedings Article (current version at Maryland Code (1996, 1998 Repl.Vol., 1999 Cum.Supp.) §§ 12–601–12–613 of the Courts and Judicial Proceedings Article). *See Hamilton v. Verdow*, 287 Md. 544, 546, 414 A.2d 914, 916 (1980). *Hamilton* dealt with an assertion of privilege in the context of discovery in a tort suit brought in federal court on the basis of diversity of citizenship. *See id.* at 547, 414 A.2d at 917.

communications justified a presumptive privilege: "[W]hen a formal claim of executive privilege is made for confidential communications of the chief executive ... or other government officials of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure." *Id.* at 563, 414 A.2d at 925 (citations omitted). We went on to hold that this presumptive privilege extended even to " 'the limited intrusion represented by an *in camera* examination of the conversations by a court.' " *Id.* (quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 498 F.2d 725, 730 (D.C.Cir.1974)).

The doctrine of executive privilege does not apply solely to opinion material. Even where the confidential communications or documents sought are factual in nature, a balancing process is used, wherein the government's need for confidentiality is weighed against the litigant's need for disclosure. *See Hamilton,* 287 Md. at 564, 414 A.2d at 925. Although compiled or severable factual material ordinarily is available for discovery, we reasoned, in *Hamilton,* that "material cannot always 'easily be separated into fact finding and decision making categories,' "*id.* at 564, 414 A.2d at 925–26 (citations omitted), recognized that "some factual material is entitled to a degree of protection under the privilege," including "facts obtained upon promises or understandings of confidentiality, investigative facts underlying and intertwined with opinions and advice, and facts the disclosure of which would impinge on the deliberative process," *id.* at 564–65, 414 A.2d at 926, and concluded that, in these situations, "the government's asserted reasons for nondisclosure are weighed against the litigant's need for discovery in light of the particular circumstances of each case." *Id.* at 565, 414 A.2d at 926.

The *Hamilton* Court further explained that "*in camera* inspection by the trial judge does not automatically follow whenever a claim of executive privilege is made," since "the *in camera* inspection itself is an intrusion upon the privilege." *Id.* at 566, 414 A.2d at 926. We concluded:

Thus, when a formal claim of executive privilege is made, with an affidavit stating that the demanded materials are of

a type that fall within the scope of the privilege, they are presumptively privileged even from *in camera* inspection. *The burden is on the party seeking production to make a preliminary showing that the communications or documents may not be privileged or, in those cases where a weighing approach is appropriate, that there is some necessity for production.* ... *Consequently, absent such a preliminary showing by the party demanding disclosure, the claim of executive privilege should be honored without requiring an in camera inspection.*

*Id.* at 566–67, 414 A.2d at 926–27 (internal citations omitted) (emphasis added).

The Governor's Office has asserted executive privilege with respect to the documents at issue in this case, i.e., the requested telephone records and appointment calendars. That assertion has been accompanied by affidavits by Governor Glendening and members of his staff, explaining how the documents fall within that privilege. I respectfully disagree with the majority opinion's dismissal of the validity of that claim. While the individual entries in the documents in question are generally "factual" in nature, in compilation they disclose the deliberative processes of the Governor's Office.

In *Times Mirror Co. v. Superior Court*, 53 Cal.3d 1325, 283 Cal.Rptr. 893, 813 P.2d 240 (1991), the California Supreme Court considered a closely analogous case in which a newspaper sought disclosure of the Governor of California's appointment calendars and schedules under the California Public Records Act, CAL. GOV'T CODE § 6250 (West 1995). In that case, like this one, the Governor had conceded that his appointment calendars were public records within the meaning of the California Public Records Act, but asserted that they were exempted from disclosure. *See Times Mirror*, 283 Cal. Rptr. 893, 813 P.2d at 250 n. 12. The California Supreme Court, citing this Court's decision in *Hamilton, see id.*, 283 Cal.Rptr. 893, 813 P.2d at 248 n. 10, held that disclosure of the documents was not in the public interest and based its reasoning, in part, on the deliberative process privilege. *See id.*, 283 Cal.Rptr. 893, 813 P.2d at 252. While the majority is correct

in pointing out that the California statute contained a public interest exemption not present in the Maryland Public Information Act, the California court's reasoning is equally applicable to the present case:

> Disclosing the identity of persons with whom the Governor has met and consulted is the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or information he deemed to be of significance with respect to critical issues of the moment. The intrusion into the deliberative process is patent.

*Id.*, 283 Cal.Rptr. 893, 813 P.2d at 251. The court concluded that "while the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative." *Id.*[3]

The United States Court of Appeals for the District of Columbia Circuit has followed similar analysis in the context of whether the President's Task Force on National Health Care Reform was required to comply with the open meeting requirements of the Federal Advisory Committee Act:

> If public disclosure of the real information-gathering process is required, the confidentiality of the advice-giving function inevitably would be compromised. *If you know what information people seek, you can usually determine why they seek it.* A group directly reporting and advising the President must have confidentiality at each stage in the formulation of advice to him.

---

**3.** This exemption was extended to telephone records of a City Council member in *Rogers v. Superior Court of L.A. County*, 19 Cal.App.4th 469, 23 Cal.Rptr.2d 412 (1993). *But cf. DR Partners v. Board of County Comm'rs of Clark County*, 6 P.3d 465 (Nev.2000) (holding that deliberative process privilege was not implicated by disclosure of county officials' cellular telephone records). While the Nevada Supreme Court disagreed with the premise of *Times Mirror* and *Rogers*, *see id.* at 470, it also distinguished those opinions on the facts of the cases, noting that, in *DR Partners*, the newspaper seeking disclosure of the records was specifically investigating possible government waste and the County had not properly accounted for payment for private use of governmental cellular phone service by government officials in the records in the trial court proceedings. *See id.* at 470–71.

*Association of Am. Physicians and Surgeons, Inc. v. Clinton,* 997 F.2d 898, 910 (D.C.Cir.1993) (emphasis added).

Similarly, in *Taylor v. Worrell Enterprises, Inc.,* 242 Va. 219, 409 S.E.2d 136 (1991), the Virginia Supreme Court held that itemized long distance telephone bills for calls placed by the Governor's office that were sought by a newspaper publisher were exempt from disclosure under the Virginia Freedom of Information Act, Va.CODE ANN. § 2.1–340 (Michie 1999). Like the Appellee in this case, the publisher in *Worrell* argued that disclosure of the phone bills would not encroach on the Governor's decision-making process because the content of the calls would remain confidential. *See id.* at 138. However, the plurality opinion [4] rejected that contention, explaining that "data which show the time and the originating and terminating location of a call is information concerning the activity of the Governor's office," since "[t]he data, standing alone, could provide a basis for public speculation" and "an information base for further investigation which could subject recipients of such calls to inquiries regarding the calls and their content." *Id.* The plurality went on to express its concern about the potential chilling effect that release of the information could have on both the Governor and the individuals that he might want to consult via telephone, arguing that "[a] lack of candor or an unwillingness to participate in the decision making process is as likely to flow from the compelled disclosure of the fact of consultation as from the disclosure of the content of the consultation." *Id.* at 139.

Concern with the potential chilling effect that disclosure of deliberative documents could have on the ability of executive officials to execute the duties of the Governor's office underlies

---

4. The three-judge plurality held that disclosure of the telephone records would be unconstitutional because the interference with the Governor's decision-making process would violate the separation of powers doctrine. *See Taylor v. Worrell Enterprises, Inc.,* 242 Va. 219, 409 S.E.2d 136, 139 (1991). The Chief Justice, who concurred in the result, argued that the separation of powers and executive privilege issues had not been properly raised for appellate review, but concluded that the phone bills were "memoranda" and were, therefore, statutorily exempt from disclosure. *See id.* at 140.

much of the jurisprudence on executive privilege. As the court in *Times Mirror* explained:

> If the law required disclosure of a private meeting between the Governor and a politically unpopular or controversial group, that meeting might never occur. Compelled disclosure could thus devalue or eliminate altogether a particular viewpoint from the Governor's consideration. Even routine meetings between the Governor and other lawmakers, lobbyists or citizens' groups might be inhibited if the meetings were regularly revealed to the public and the participants routinely subjected to probing questions and scrutiny by the press.

*Times Mirror*, 283 Cal.Rptr. 893, 813 P.2d at 251. The United States Supreme Court has also recognized the importance of the expectation of executive confidentiality:

> The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974).

This potential for disruption of the essential communicative, investigative, and deliberative functions of the Governor's office are equally in force in this case. In fact, these policy concerns are particularly compelling in the face of the sweeping scope of the Appellee's demand for production of docu-

ments in this case and the lack of any specifically identified public interest by the Appellee in these particular materials. The majority stresses the age of the documents that are being sought in this case as undermining the potential chilling effect of their disclosure on the Governor's ability to access a broad spectrum of viewpoints, *see* maj. op. at 563–65, but this is hardly a determinative factor. I see no reason to believe that a government official or community member might not be just as hesitant to engage in a confidential communication whether it was likely to be disclosed immediately or in four years.

Nonetheless, that is not to say that there is *no* situation under which the types of records sought here should be obtainable. Under the balancing test outlined in *Hamilton*, 287 Md. at 564–65, 414 A.2d at 925–26, it is conceivable that the doctrine of executive privilege might not shield telephone or appointment records that were subject to a more focused and limited request that would have substantially less of an impact on the deliberative process.[5] That simply is not the situation here, where Appellee has requested all of the Governor's schedules and telephone records for himself and several members of his staff, covering a six month period, without offering any evidence to dispute the Governor's initial showing that the requested documents are protected by executive privilege.

Given the doctrine of executive privilege outlined by this Court in *Hamilton*, and given the policy concerns with the chilling of the important constitutional functions of the Governor and his staff, I would reverse the decision of the Circuit Court and hold that, as a matter of law, the Appellee has not

---

5. *Cf. Times Mirror Co. v. Superior Court*, 53 Cal.3d 1325, 283 Cal.Rptr. 893, 813 P.2d 240, 253 (1991):

> There may be cases where the public interest in certain specific information contained in one or more of the Governor's calendars is more compelling, the specific request more focused, and the extent of the requested disclosure more limited; then, the court might properly conclude that the public interest in nondisclosure does not clearly outweigh the public interest in disclosure, whatever the incidental impact on the deliberative process.

made a sufficient showing of necessity to overcome the presumption of executive privilege for the requested documents. Accordingly, I dissent.